373 So.2d 1324 (1979)
Howard PAYTON
v.
The TRAVELERS INSURANCE COMPANY, Associated Indemnity Corporation, et al.
No. 10239.
Court of Appeal of Louisiana, Fourth Circuit.
July 3, 1979.
Rehearing Denied September 10, 1979.
*1326 Kronlage, Dittmann & Caswell, Albert S. Dittmann, Jr., New Orleans, for plaintiff-appellee.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John J. Weigel and Madeleine Fischer, New Orleans, for defendants-appellants.
Law Offices of James J. Morse, Julian G. Baudier, Jr., New Orleans, for intervenor-appellee, The Travelers Ins. Co.
Before SAMUEL, LEMMON and GARRISON, JJ.
LEMMON, Judge.
This is a tort action against certain executive officers of plaintiff's employer, Louisiana Industries (LI), and the officers' insurer. After a trial on the merits judgment was rendered against all defendants, and they appealed. Issues on appeal involve negligence, contributory negligence, causation and quantum of damages, and prescription as to one executive officer sued by supplemental petition.

I
Plaintiff, a mechanic's helper at one of LI's concrete plants, was injured on the job when he fell while lifting a cylinder head onto the motor of a concrete truck.
Prior to the accident James Burkhammer, the head mechanic in the repair shop, called plaintiff and another employee to assist him in lifting the cylinder head, which weighed 150 to 200 pounds, to a height of five to six feet above the ground. While standing on the ground, the three men lifted the cylinder head onto the right fender of the truck. Then, while Burkhammer stood on the left fender in order to catch the cylinder head on that side of the truck when it was lifted over the radiator, plaintiff (standing with one foot on the fender and one foot on a sawhorse) and the other helper (standing with both feet on the front bumper of the truck) lifted the cylinder head to the top of the truck, at which point plaintiff's feet slipped. When plaintiff fell, the cylinder head fell on top of him.
Plaintiff testified that the safe handling of the cylinder head required use of a hoist, that the only hoist provided by LI was inoperable on the day of the accident in that it tilted over to the left when weight was placed upon it, and that the hoist had been inoperable during the entire eight months he worked for the company. Contending that William Dobson (general manager of LI's operations in South Louisiana), Edward Engel (LI's production manager) and Nelson Gauthier (shop foreman of the particular concrete plant) knew or should have known that the hoist needed to be repaired or replaced, plaintiff argues these parties were liable for failing to provide him with a safe place to work and with safe equipment with which to perform his assigned duties.
Dobson, who oversaw the general operations of several plants and offices, testified that he had delegated responsibility for the overall operation of this particular plant to Engel and that he visited this plant only on infrequent and unscheduled occasions.
While Engel had general supervision of other plants, he had an office on the floor above the mechanic's shop in this plant. Engel delegated responsibility to the various department heads and shop foremen in the plant, and responsibility for the mechanic's shop fell upon Nelson Gauthier, plaintiff's foreman. Thus, while neither Dobson nor Engel was in a position to be aware of the condition of equipment in the mechanic's shop on a day-to-day basis, Gauthier was.
*1327 Gauthier testified that the shop employees were instructed to use the hoist, which was the only piece of lifting equipment in the shop, for lifting cylinder heads and such objects in excess of 100 pounds. He further stated that the hoist was operative at the time of the accident and that no employee had ever reported the hoist was inoperative.
Burkhammer, the head mechanic, testified that the hoist was operative and that he instructed plaintiff and the other employee to use the hoist, but that they refused. He did admit, however, the hoist had tilted on prior occasions so that with heavy loads someone often stood on the rear platform to counterbalance the load.
Two other LI employees, still working for the company at time of trial, testified that the hoist had not been used much for a long time prior to the accident, one noting that the hoist had a tendency to tilt to the side.
The trial court apparently concluded the hoist was not in proper condition to perform its function of lifting heavy equipment, and review of the record reveals no manifest error in such a factual determination.
Nevertheless, both Dobson and Engel had properly and prudently delegated their responsibility for general safety and for repair and replacement of repair shop equipment to subordinates who were not shown to be incompetent. Neither was personally at fault in creating the dangerous condition, and neither can be charged with constructive knowledge of the condition. On this record neither can be held liable for damages caused by failure to have a properly operating hoist, and the judgment must be reversed as to these two defendants.
However, Gauthier was the person who was delegated the responsibility for the maintenance of such equipment as was necessary for the safe operation of the mechanic's shop. He knew or should have known that the hoist for a long period of time needed to be repaired or replaced. His failure to take prudent action to remedy the hazardous condition breached the personal duty he owed to plaintiff as an employee in the shop and rendered him liable for any damages caused by this failure. Canter v. Koehring Co., 283 So.2d 716 (La.1973).

II
Defendants contend plaintiff himself was solely responsible for, or assumed the risk of, his foreseeable injury when he refused to use the hoist and then failed to use common sense in manually lifting the cylinder head.
Defendants' evidence on plaintiff's refusal to use the hoist was contradicted, and the conflict was apparently resolved against defendants' position. (Moreover, Burkhammer's testimony was illogical in that he admitted one man could lift the cylinder head with the hoist, but stated he did not use the hoist because the people he summoned to assist in lifting refused to use it.)
The more difficult problem is plaintiff's positioning of himself preparatory to the second step of the two-step lifting of the cylinder head. Plaintiff's placing himself with his feet off the ground, in a position where a slip was a distinct possibility, does appear to the reasonable person to be indeed risky. Nevertheless, such conduct did not necessarily constitute consent to the risk of slipping under the overall circumstances.
LI's executives set up the circumstances whereby plaintiff and others were required to perform assigned duties without the benefit of equipment necessary for safe performance. Under such circumstances the subordinate employees cannot truly be said to have voluntarily consented to expose themselves to risks incident to performance under substandard conditions. Their real choice, after being deprived of the protection owed them, was to perform their duties with the tools and equipment that were available or to quit, and choosing the former course was not assumption of risk that bars recovery for injuries resulting from exposure to the risk.
*1328 Moreover, the negligence aspect of this case involves a comparison of duties.[1] In considering negligence and contributory negligence in a given situation, a court does not necessarily demand identical conduct of the plaintiff and the defendant, and varying factors affect what conduct the standard of a reasonable man requires. Hall v. Hartford Acc. & Indem. Co., 278 So.2d 795 (La.App. 4th Cir. 1973), cert. den., La., 281 So.2d 753.
In the present case the executive officer who had the responsibility for safety in the mechanic's shop was required to exercise a high degree of care in furnishing employees safe and adequate equipment to perform expected tasks.[2] When the executive officer failed to meet this high standard of care and injury resulted directly from this failure, he cannot reasonably be allowed to escape responsibility for the injury by contending the subordinate employees should have reported the lack of safe and adequate equipment, when the equipment had been lacking for a long period of time. Furthermore, the executive officer cannot escape responsibility by contending the employees, who were forced by the lack of safe and adequate equipment to use alternative methods of performing their duties, used an unsafe or unreasonable method, unless the executive officer shows there were several obvious alternative methods and the injured employee chose an unreasonably unsafe method over one which was not unreasonably unsafe.
Here, plaintiff and two other employees were required, because of the lack of a properly operating hoist, to manhandle a heavy engine part up to a considerable height. To do so they placed themselves in precarious positions, with the attendant risk of slipping, but the record does not show any alternative method which patently was more reasonably safe.
Under the overall circumstances shown by this record we cannot say the trial court erred manifestly in ruling that the injury resulted from the failure to furnish safe and adequate equipment and that plaintiff's recovery was not barred by contributory negligence or assumption of risk.

III
Dobson, Engel and the insurer of LI's executive officers were sued within one year of the accident, but Gauthier was not named as a defendant until long after the year had elapsed. On appeal Gauthier reasserts his plea of prescription.
A timely suit against the insurer of a corporation's executive officers interrupts prescription as against the executive officers, who are solidary obligors with the insurer. Simmons v. Travelers Ins. Co., 295 So.2d 550 (La.App. 3rd Cir. 1974), cert. den., La., 299 So.2d 795, 796. Accordingly, plaintiff's suit against Travelers as Gauthier's insurer interrupted prescription on plaintiff's claim against Gauthier, and the exception was properly overruled.[3]

IV
In the October 3, 1970 accident plaintiff sustained injuries to the chest, back, neck and both knees. After being hospitalized for 13 days, plaintiff was treated conservatively by a general surgeon. At the physician's advice plaintiff attempted to return to work on October 23, but was unable to do so because of pain. Treatment continued through December 4, when the doctor discharged plaintiff, noting he had never exhibited any objective findings to substantiate his persistent complaints.
*1329 During that period of treatment plaintiff had been referred to an orthopedic surgeon, who opined that the accident had caused no skeletal damage.
On December 8, 1970 plaintiff consulted an orthopedic surgeon recommended by his family doctor, complaining primarily of low back pain. The doctor diagnosed a contusion of the lower abdomen, which was responding to treatment. When complaints persisted after subsequent examinations were completely normal from an orthopedic standpoint, the doctor suggested a neurological evaluation.
Pursuant to this recommendation plaintiff consulted a neurosurgeon in February, 1971. This doctor found objective back limitations, spasm and tenderness of the sciatic nerve on the right and recommended definitive hospital studies. After a myelogram (which also revealed minor irregularities in the cervical area), the doctor diagnosed a ruptured lumbar disc and surgically removed the torn component of the L5-S1 disc on the right.
Plaintiff continued under the doctor's care. In November, 1972 he was hospitalized with continuing neck and low back pain, but a myelogram did not reveal problems of a magnitude that would call for surgery. At periodic examinations thereafter plaintiff continued to complain of pain, but did not display any objective neurological symptoms. As of February, 1975 the doctor opined plaintiff was still incapable of remaining reasonably comfortable and attempting full-time work which would require climbing, jumping or lifting weights above 20 pounds.
After another myelogram in May, 1976 plaintiff underwent another surgical procedure, in which torn disc components were removed at L4-L5 and L5-S1 on the left and the sensory component of the disc was sectioned.
At the time of the May, 1978 trial the doctor still required plaintiff to limit his activities, but suggested he could work in a limited capacity, without climbing, jumping, lifting or long periods of standing, as long as he was allowed to rest, or to alternate standing and sitting, and to use medication. (At the time plaintiff was driving a taxicab part-time, as his tolerance dictated.) The doctor assigned a 15% permanent anatomical disability, a 100% permanent functional disability as to climbing, jumping and lifting, and no disability as to light or modified job assignments. All of the problems and the ultimate disability were deemed to be caused by the 1970 trauma, since plaintiff had no prior complaints and was persistently symptomatic after the documented injury which suggested this type of disability.
Defendants contend the trial court erred in connecting the permanent disability with this accident, because plaintiff was pronounced fit to work as a mechanic several weeks after the accident, showed no objective symptoms until four months later, and after the 1971 surgery still showed no objective symptoms until the 1976 surgery.
The fact that objective symptoms to support plaintiff's persistent complaints did not appear until four months after the accident was characterized as "not unusual" by the neurosurgeon. Moreover, the doctor testified he believed strongly that when a disc rupture follows a specific injury of this type with no intervening injury, the original injury is the factor which initiates the problem, even if the onset is months or years after the injury.
We conclude this record supports a finding that the 1970 accident caused the ruptured discs and the ultimate disability.

V
The trial court awarded $80,000.00 for pain and suffering, $3,740.62 for medical expenses, $38,805.00 for loss of wages, and $115,817.00 for loss of future wages.
The award for medical expenses is not contested on appeal, and the award for pain and suffering for a previously healthy man, who had suffered persistent back and neck pain for almost eight years and who was faced with a permanent disability over his life expectancy of 34.2 years, is within the range of much discretion accorded the trial court by C.C. art. 1934(3).
*1330 Plaintiff's work record prior to the accident showed a pattern of consistent employment, and at times he had held two jobs. At the time of the accident (October, 1970) he was 29 years old and was earning $2.75 per hour, averaging 50 hours per week, for a gross salary (including overtime) of $151.00 weekly and $7,852.00 annually. At the time of trial (June, 1978) he was earning approximately $300.00 a month as a part-time taxicab driver.
An expert in actuarial science calculated plaintiff's past lost earnings by assuming his earnings would have increased by 60% between 1970 and December, 1977 (60% being the rise in the national consumer price index for the period), and then averaging the increase over the entire period by taking the $151.00 weekly earnings in October, 1970 and the $242.00 assumed weekly earnings in December, 1977 to obtain average weekly earnings of $189.50. Thus, over the 398-week period total earnings would have amounted to $78,207.00. However, on the basis that plaintiff's earning capacity was not totally impaired, the expert further assumed plaintiff could have earned the minimum wage, and he deducted the amount of these assumed earnings over 398 weeks, leaving a loss of past wages of $38,805.00, the amount awarded by the trial court.
For future lost wages (more properly, impairment of earning capacity), the expert calculated the amount of a fund on the day of trial which, if invested at a 6% return, would pay plaintiff his calculated average weekly earnings (increased thereafter by an assumed annual salary growth of 5%) and would be totally exhausted at the end of 23.3 years, plaintiff's work-life expectancy at time of trial. The amount was $291,199 at $242.00 weekly. Again assuming plaintiff would have earned the minimum wage over this period (increased annually by 5%), the expert deducted these assumed minimum earnings of $175,382.00, leaving an estimated loss of earnings over plaintiff's work-life expectancy of $115,817.00, the amount awarded.
Defendants point out the expert considered earnings before taxes, rather than after, and admitted there were many sound investments yielding 9 to 10% returns, rather than the 6% he used as the discount rate. Nevertheless, the determination of an award for past lost earnings and particularly for impairment of earning capacity cannot be calculated with mathematical certainty, but sound judicial discretion should be exercised after all factors have been weighed. Edwards v. Sims, 294 So.2d 611 (La.App. 4th Cir. 1974). Many factors must be considered, including plaintiff's physical condition prior to the accident, his past work record as to consistent employment and amount of earnings, and the probability he would have continued to earn wages over the remainder of his working life as he did in the past, if he had not sustained the injury. Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968).
Calculations based on assumptions only provide a guide for the trier of fact to utilize in exercising the much discretion authorized for fixing the amount of damages caused by an offense or quasi-offense. While the expert in this case reasonably could have used a higher discount rate or could have assumed a partially disabled person with two years of college education should earn more than minimum wage (at least after a period of rehabilitation and training), these are considerations which should be (and presumably were) argued to the trial court prior to the setting of the award (just as the plaintiff argued it was unreasonable to assume plaintiff could work 50 hours per week, even at minimum wage employment).[4]
While we may say in the present case that the awards were generous, we cannot say that the trial court's discretion was so unreasonably exercised so as to be abusive.
Accordingly, the judgment of the trial court is reversed in part, and it is ordered *1331 that plaintiff's suit be dismissed as to William Dobson and Edward Engel. In all other respects the judgment is affirmed.[5]
REVERSED AND RENDERED IN PART, AFFIRMED IN PART.
NOTES
[1] See the discussion of comparison of duties as the basis for imposition of liability on one of two negligent parties in Baumgartner v. State Farm Mut. Auto. Ins. Co., 356 So.2d 400 (La. 1978).
[2] Engel admitted that if proper lifting equipment was not available, the failure would be a violation of the company's safety program.
[3] As long as the insurer is solvent and the policy limits exceed the damages, the only significant question in a direct action against the insurer is whether its policy provides coverage for the executive officer who is proved to have caused the damage.
[4] In Profit v. Linn, 346 So.2d 253 (La.App. 1st Cir. 1977), relied on by defendants, the defendants successfully argued to the trial court that consideration should be given to the fact plaintiff, although disabled from his former trade, was able to perform less strenuous work. Here, the trial judge did give substantial consideration to this fact.
[5] The judgment of the trial court awarded a specific sum to the intervening workmen's compensation insurer (who also was the liability insurer of the executive officers). Presumably, compensation payments were continued after judgment, and it is the intent of this decree that the insurer get full credit against the tort judgment for all compensation payments.