401 So.2d 500 (1981)
Thomas Lamar WILSON, Plaintiff-Appellant-Appellee,
v.
AETNA CASUALTY AND SURETY COMPANY, et al., Defendants-Appellants.
No. 14560.
Court of Appeal of Louisiana, Second Circuit.
June 8, 1981.
*501 Troy E. Bain and Pringle & Herzog by R. Perry Pringle, Shreveport, for plaintiff-appellant-appellee, Thomas Lamar Wilson.
Lunn, Irion, Switzer, Johnson & Salley by Richard H. Switzer and Jack E. Carlisle, Jr., Shreveport, for defendants-appellants, Bob W. Herren, Don Waldrop and Aetna Cas. and Sur. Co.
Before HALL, JASPER E. JONES and FRED W. JONES, Jr., JJ.
*502 HALL, Judge.
This is an executive officer suit arising out of a 1974 industrial accident in which the fingers of plaintiff's right hand were crushed between the ram and the base of a corrugating press as plaintiff was pushing a sheet of metal through the press. Pursuant to a jury verdict, judgment in the amount of $175,000 was rendered in favor of plaintiff, Thomas Lamar Wilson, against defendants, Bob W. Herren and Don Waldrop, the president and the office manager of Herren Metals, Inc., and Aetna Casualty & Surety Company, their liability insurer.
All parties appealed, defendants contending the judgment is erroneous on liability and plaintiff contending the amount of damages awarded is inadequate. Defendants argue on appeal that the accident was caused by plaintiff's negligence in inserting his hand into the operating machine, that the trial court erred in allowing evidence of a prior accident, and that defendants had delegated responsibility for the safety of the company employees to the shop foreman.
Plaintiff argues that the award of $175,000 is entirely inadequate to compensate plaintiff, who lost four fingers of his right hand, for general damages and for past and future loss of earnings and earning capacity. Plaintiff also contends the trial judge erred in refusing to give a requested jury instruction relating to loss of earning capacity.
We amend the judgment to increase the award to $252,779.15, and otherwise affirm.
Facts
Herren Metals, Inc. was a business that manufactured and fabricated sheet metal products. The business was started in 1966 by the defendant, Bob Herren, who was the principal stockholder, president, and operating head of the company. Defendant, Don Waldrop, was vice president of the company and served as office manager or general manager. Alton B. Jean was general superintendent or shop foreman. Jean was originally named as a defendant but was voluntarily dismissed from the case by the plaintiff during the progress of the trial.
Company policy was to have employee safety meetings every Monday which were attended by Jean and sometimes by Herren and Waldrop. There is no evidence that the company had any other formal safety programs or procedures. Although authority for day-to-day operational safety was delegated to Jean, the evidence, particularly the testimony of Jean, establishes that Waldrop had responsibility in this area and that Herren had and exercised the final authority relating to safety and, especially, to equipping the machinery with safety devices.
The business used several pieces of heavy machinery in its production activities, one of which was a corrugating press machine. The function of the machine is to corrugate flat sheets of metal. The press is about 12 feet long and is operated by an operator who stands at the right end of the machine and a helper who stands at the left end of the machine. The operator and the helper place a sheet of metal on notched arms extending out from the press. There is a control panel at the operator's end of the press which contains a starter button by which the operator starts the motor. The corrugating mechanism of the press is activated by the operator pressing a pedal with his foot. When the pedal is pressed a ram with a die attached comes down with considerable force and makes contact with the metal which lies on a die at the base of the press, corrugating the metal sheet. While the pedal is pressed the ram moves down and up in a repetitive, continuous fashion. As the ram moves up the operator and helper manually advance the sheet of metal into the press one notch at a time. When the ram makes a corrugation at the last notch the operator takes his foot off the pedal and the ram stops in the up position. It is then necessary for the operator and the helper to manually move the sheet of metal farther into the machine so that the last or final corrugation can be made. In order to do this it is necessary that the men put a substantial portion of their fingers into the machine. Although Herren testified that the operation can be performed without putting the fingers into the machine, the *503 testimony of all of the other witnesses who worked with the machine is to the contrary and it was firmly established that this was the customary manner in which the operation was performed. After the sheet of metal is placed in this final position the operator again presses the pedal and the ram comes down and makes the final corrugation. A worker behind the machine then pulls the corrugated sheet out of the press and the operation is repeated with another sheet.
At the time of the accident plaintiff had been working in the shop more than three years and was thoroughly familiar with the operation of the machinery, including the corrugating machine. On the day of the accident he was working as the helper on the corrugating machine which was being operated by Louis Longorio. He had been working for several hours and had assisted in corrugating several hundred metal sheets. As a sheet was being completed, plaintiff thought the motor had stopped and was pushing the metal sheet into the final position, with his fingers inside the machine. The ram came down and plaintiff's fingers on his right hand were crushed between the ram and the sheet of metal resting on the base of the press. The operator of the press, Longorio, testified they were at or near the last step in the operation but that he could not remember whether he had taken his foot off the pedal and stopped the motor at the time the accident happened.
Evidence was offered at trial, over defendants' strenuous objection, that a similar accident on this corrugating machine had occurred about one year earlier. Both the operator and the helper who was injured in the previous accident testified. The helper's fingers were crushed when the ram came down as he was placing the sheet of metal into the final position. The helper testified the ram had stopped when he started the final operation, but then the ram came down. The operator on that occasion testified that although he took his foot off the pedal and the ram should have stopped, it did not stop and came down one more time. The operator testified that on several occasions the ram had failed to stop as it should have when he took his foot off the pedal.
A safety engineer and inspector for the defendant insurance company testified that after the previous accident he made strong recommendations to Herren that safety devices be installed on the machine. Among his recommendations was the installation of an electric eye which would stop the machine when a worker's hands were between the ram and the base. Four or five other safety devices were also recommended. The recommendations were made in August and September, 1973 and the inspector made follow-up visits to the company in January and March 1974 at which time none of the recommendations had been put into effect. The accident happened on May 23, 1974.
It was established that after the first accident and after his discussion with the insurance company inspector, Herren contacted an electrical company to make arrangements for the installation of an electric eye safety device on the machine. However, the device had not been installed on the date of plaintiff's accident, some 13 months after the prior accident, and was not installed until several months after plaintiff's accident.
Dr. Paul N. Hale, Jr., a professor at Louisiana Tech University and an industrial engineer with considerable experience in industrial safety, testified that the corrugating machine was extremely dangerous. He testified as to various safety devices that are available and in use on similar presses in other industrial establishments. The witness described several safety devices, including some of those described by the insurance company inspector, which would make it difficult or impossible for the ram to operate while a worker's hands were in the machine or which would have made it unnecessary for the worker to put his fingers into the machine to complete the corrugating operation.
Liability of the Defendants
An employer owes a duty to an employee to provide the employee with a *504 reasonably safe place to work and has a duty not to require the employee to work under conditions that expose the employee to an unreasonable risk of harm. Where this duty is delegated by an employer to an officer, agent or employee, the officer, agent or employee is individually liable for a breach of this duty through personal fault, that is, a breach of a personal duty owed to the injured plaintiff which specifically has caused the plaintiff's injuries. If the general responsibility of the defendant officer, agent, or employee has been delegated with due care to some responsible subordinate he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or should know of its nonperformance or malperformance and has nevertheless failed to cure the risk of harm. Canter v. Koehring Company, 283 So.2d 716 (La.1973); Miller v. Employers Mutual Liability Insurance Company, 349 So.2d 1353 (La.App.2d Cir. 1977).
The evidence in this case clearly establishes that the corrugating press was an extremely dangerous machine. The evidence establishes that it could have and should have been equipped with safety devices. There was a breach of the duty to provide the plaintiff with a safe place to work because he was exposed to an unreasonable risk of harm.
The evidence also establishes that the defendants had been delegated the responsibility for discharging the employer's duty to the employee in regard to safety. In this relatively small business enterprise Herren and Waldrop had personal knowledge of the details of the shop operations and individual responsibility for decision-making in connection with these operations. Herren in particular was the officer who had specific authority and exercised that authority on decisions relating to the purchase of equipment and the equipping of machinery with safety devices. He owed a personal duty to the plaintiff and breached this duty by failing to equip the dangerous machine with available safety devices even though he had personal knowledge of the danger involved. This breach of duty was the specific cause of plaintiff's injury.
It was not established that the defendants' responsibility for safety and, particularly, their responsibility for the purchase of safety equipment had been delegated to the foreman, Jean. The officerdefendants, particularly Herren, retained this responsibility, were personally at fault, and are liable for the negligent performance of this responsibility.
Evidence of Prior Accident
The prior accident occurred fairly close in point of time to the accident involved in this case. It involved the same machine and occurred in an almost identical manner. Evidence of the prior accident was admissible to show the prior malfunction of the machine, the dangerous nature of the machine, and the knowledge of the defendant-officers of the dangerous condition.
Defendants rely on Miller v. Employers Mutual Liability Insurance Company, supra, where evidence of prior accidents and injuries was held to be inadmissible when it was not established how, when, or where the other injuries occurred or that they were in any way related to the accidents at issue. This court noted in the Miller case, however, that evidence of prior injuries may, under limited circumstances, be admissible to show notice of an existing particular hazardous condition, where the prior injuries are closely related in circumstance to the injury or hazard at issue. The circumstances of the prior accident in the instant case meet the criteria of Miller, and evidence of the prior accident was properly admitted.
Contributory Negligence
Defendants argue that the plaintiff was contributorily negligent in placing his fingers into the machine while it was operating because he well knew the danger of doing so. Defendants point out that the machine had a sign on it warning workers to keep their hands clear. Defendants cite the Miller case where recovery was denied in an executive officer suit on a finding *505 that the plaintiff was contributorily negligent.
At the time of the accident plaintiff was performing a duty which his employment specifically required in the manner in which he had been trained by his supervisors. He thought the machine had been turned off by the operator. One of the inherent dangers of the machine was a lack of communication or coordination between the operator and the helper. The evidence does not establish that plaintiff was negligent. The probability is that the accident was caused by the danger inherent in the operation being conducted, involving as it did coordination and timing between the operator and the helper. A workman is not held to be contributorily negligent because he does work assigned to him under dangerous conditions for which his employer is responsible and at which assignment he must work or suffer dismissal. Coco v. Winston Industries, Inc., 330 So.2d 649 (La. App. 3d Cir. 1976), reversed as to quantum 341 So.2d 332 (La.1977); Payton v. Travelers Insurance Company, 373 So.2d 1324 (La. App. 4th Cir. 1979), writ denied 377 So.2d 119 (La.1979).
Jury InstructionLoss of Earning Capacity
The plaintiff contends that the trial judge erred in failing to give a requested instruction to the jury relating to loss of earning capacity. Plaintiff argues that the failure to give the requested instruction resulted in the jury failing to make an adequate award for this item. Plaintiff further contends that, in any event, the jury's award is so low as to amount to an abuse of discretion and that the award should be increased by this court.
The requested instruction read as follows:
"Damages should be estimated on the injured person's ability to earn, rather than what he actually earned before the injury." * * * "Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done to him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily."
The instructions given by the trial judge related to loss of earnings and earning capacity were as follows:
"Such items of damages as are capable of mathematical demonstration must be proved with exactness. The amount of damages for such items as loss of past or future wages or future medical or other expenses are speculative and cannot be calculated with mathematical exactitudes, but should be determined by the jury in its sound discretion and considering all the circumstances in the amount as is just to both litigants and not unduly oppressive to either.
"If the plaintiff's injury does not totally disable him but it does lessen his earning ability, then you may award such damages as you feel will compensate him for the loss of his earning ability."
The requested instruction was one of six special charges requested by the plaintiff relating to loss of future wages and earning capacity. The requested instruction is a fair statement of the law, being verbatim excerpts from a recent authoritative supreme court decision. See Folse v. Fakouri, 371 So.2d 1120 (La.1979). We find, however, that the charge given by the trial judge is also a fair statement of the law relating to loss of future wages and earning ability, and adequately instructed the jury on these items of damage. Viewing the charge to the jury as a whole, if all of the plaintiff's requested instructions relating to these items of damage had been given there would have been too much weight and emphasis on these particular items. In instructing the jury the trial judge need not include every requested instruction, even though the requested instructions are fair statements of the law; indeed, the trial judge needs to strike a balance so that no one issue before the jury is unduly emphasized. In this instance, the trial judge properly exercised his discretion in formulating *506 the jury instructions as a whole and the instructions given on loss of future wages and earning capacity were adequate.
Amount of Damages
Plaintiff seeks an increase in quantum contending that the amount awarded by the jury is so inadequate as to be an abuse of the jury's discretion in setting quantum. The jury awarded damages in the sum of $175,000; having been instructed to deduct $22,220.85, the amount plaintiff had received in workman's compensation benefits, the jury's total award was $197,220.85. The jury did not attribute any specific sum to general damages or to loss of earnings, but indicated only the lump sum award. Plaintiff contends that, at a minimum, he should receive $150,000 in general damages to compensate him for his pain and suffering and for permanent disfigurement. This would leave only $47,220.85 to compensate plaintiff for loss of past and future earnings. Plaintiff contends that even if only $100,000 of the total award is attributed to general damages, that leaves only $97,220.85 for loss of past and future earnings and for loss of earning capacity which, he contends, is woefully inadequate in view of the evidence he presented regarding these items of damage.
The following facts gleaned from the evidence and the testimony are pertinent to the issue of quantum.
The plaintiff, born in 1952, is a native of Shreveport who graduated from Fair Park High School in 1970 where he was very active in sports. He attended Northwestern University where he was enrolled in the wildlife management curriculum. Throughout his school career, plaintiff was generally an average or "C" student. After attending college for eight months, plaintiff dropped out of school and returned to Shreveport. He secured a job with E. L. Burns Company, a company specializing in the manufacture of prefabricated walkway covers and decorative louvres. He left this job to work for Herren Metals. Plaintiff was 22 years old at the time of the accident and led a very active life, engaging in several recreational sports, such as tennis, softball, and water skiing.
Plaintiff's accident occurred between 6:00 and 6:30 p. m., May 23, 1974. He was taken by ambulance to the hospital where his fingers were amputated. Plaintiff remained hospitalized for eight days. For a month after his release, plaintiff saw the doctor once a week on a outpatient basis; plaintiff then saw the doctor about every two weeks until August 1974. Plaintiff returned to work at Herren Metals about six weeks after the accident where he did odd jobs until his dismissal in the fall of 1974. He was still experiencing some pain and had not yet adjusted to the loss of his fingers. In December 1974, plaintiff underwent additional surgery to remove webbing between what remained of his fingers. This operation, which required a hospital stay of three days, left him with greater movement in the nubs of his fingers.
Plaintiff testified that because he was right-handed he had to learn how to do many things with his left hand after the accident. He initially had problems shaving, combing his hair, buttoning his shirt, eating, and tying his shoes. He tried to learn to write with his left hand, but failed; he then tried to write with his damaged right and, after much practice, succeeded. Plaintiff can no longer play softball, but has adapted himself to engage in some sports in spite of his disability. He manages to play tennis by switching his racket from hand to hand. He manages to water ski by using a double-handled rope, placing the right handle behind his right wrist. Other than the physical handicap caused by the accident, plaintiff has problems meeting people and shaking hands and suffers some embarrassment because of his disfigurement.
From the fall of 1974 until the fall of 1975 plaintiff remained unemployed. He then entered nursing school and worked weekends as an orderly at a local hospital. Between semesters plaintiff worked several odd jobs including working as a janitor. Plaintiff left nursing school in the fall of 1976 because he felt it was not working out satisfactorily. Plaintiff remained unemployed, *507 although he searched for work on his own and also tried to obtain work through an employment agency. In March 1977, plaintiff obtained employment as an assistant warehouse manager. At time of trial in October, 1980, plaintiff was still so employed and was making $6.45 an hour. His earnings for 1979, with overtime, were $16,282.44.
Plaintiff began working for Herren Metals, Inc. in 1971. At the time of the accident, he was making about $3.75 per hour. Plaintiff testified it was his intention prior to the accident, to continue to work in the sheet metal industry and to eventually become a journeyman sheet metal worker after apprenticeship with the sheet metal workers union.
To substantiate his claim for loss of past and future earnings and for loss of earning capacity, plaintiff offered the testimony of two expert witnesses. Dr. Richard Galloway, an expert in vocational rehabilitation and employment rehabilitation counseling, testified that, although plaintiff is doing very well in his current job, he now lacks the versatility which would allow him mobility in the labor market. He testified that the traditional crafts, such as pipefitting, carpentry, and the like, are closed to plaintiff because he no longer has the finger dexterity that is required for those types of jobs. Dr. Galloway further testified that it was probable, based on plaintiff's motivation and ability, that if plaintiff had not lost his fingers he could have advanced through the union training program and become a journeyman sheet metal worker. If plaintiff had become a sheet metal worker, he could be earning $12.65 an hour as of the time of trial.
To establish the amount of damages sustained because of impaired earning capacity caused by the accident, plaintiff presented evidence consisting of the estimated amount of earnings he could reasonably have been expected to receive from the date of the accident until the time of trial and from the time trial over the remainder of his working life, minus the amount of earnings plaintiff had actually received since the accident and could be reasonably expected to receive in the future. Dr. Luvonia Casperson, an expert in economics, estimated plaintiff's loss of past earnings, i. e., earnings he would have received from the time of the accident until the time of trial, at $58,664.64. Dr. Casperson arrived at this figure by taking the $3.75 an hour plaintiff was making in 1974, by presuming that plaintiff's hourly wage would increase each year until he would be making $12.65 an hour at time of trial (the economist determined this to be equal annual increases of $1.50 per hour) and multiplying these figures to obtain an estimate of what plaintiff's earnings would have been over the six-year period from the accident until the time of trial. The wages that plaintiff had actually made were then subtracted from this total figure to produce the figure of $58,664.64.
To calculate the loss of future earnings, the economist first determined from statistical information published by the Department of Labor that plaintiff at age 28, his age at the time of trial, has a work-life expectancy of 34.1 years until he reaches the age of 62. She then calculated the difference between the hourly wage that plaintiff was making at time of trial, $6.45 an hour, and what he would have been making as a journeyman sheet metal worker, $12.65 an hour, the difference being $6.20 an hour. The economist then took this difference in the hourly wage and calculated plaintiff's projected loss of earnings over the remainder of his expected work life. In order to reach a more accurate projection, the economist applied three factors in calculating plaintiff's loss of future earnings: (1) an annual inflation factor of 4 percent (which the expert noted was a very conservative figure); (2) an annual productivity factor of 2.8 percent; and (3) a discount factor of 5.5 percent. Based upon these calculations Dr. Casperson determined that plaintiff's loss of future earnings over the remainder of his work-life expectancy equaled $530,879.48. All of Dr. Casperson's calculations were based on a 40-hour work week, 52-week work year.
*508 In Schexnayder v. Carpenter, 346 So.2d 196 (La.1977), the court held that the appropriate procedure for testing whether the jury abused its discretion by making an excessive award is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the jury. The converse of this is also true: in determining whether the trier of fact abused its discretion by making an inadequate award, the evidence must be viewed in the light most favorable to the defendant.
That plaintiff would have become a journeyman sheet metal worker if the accident had not occurred is speculative to some extent. The evidence shows that to join the sheet metal workers union, an applicant must meet certain qualifications, must be employed in a union shop, and must serve a four-year apprenticeship. Although plaintiff testified that it was his intention to join the sheet metal workers union and the vocational rehabilitation expert testified that plaintiff had the ability to do this, the fact is that plaintiff had made no move in that direction at the time he was hurt. However, plaintiff had been working in the sheet metal industry for approximately four years and it is likely that he would have pursued his intention to join the union.
With regard to the economist's calculations of plaintiff's loss of earnings, we deem the following considerations to be pertinent. First of all, given plaintiff's ability and motivation, which were taken into account in anticipating that he could have and would have advanced to the position of journeyman sheet metal worker, it should also be anticipated that plaintiff will advance steadily beyond his present position as assistant warehouse manager. It could well be anticipated that the gap between what plaintiff actually earns in the future and the pay scale of a journeyman sheet metal worker will narrow in future years.
Additionally, we must consider that the economist's projections are based on 52 full work weeks per year. This does not take into account vacation time or periods of unemployment. There is evidence in the record that a typical union sheet metal worker's employment fluctuates with the demand for that type of work, seniority, and other factors. On the other hand, however, the economist did not take into account the possibility of overtime, which sheet metal workers ordinarily work when employed.
Finally, it could well be argued that the 5.5 percent discount figure used by the economist in making her calculations, while approved in a number of cases, is low in view of the average returns on investments over the past few years. The higher the discount percentage used, the lower the present value of future earnings.
Loss of future earning capacity cannot be calculated with mathematical certainty. Philippe v. Browning Arms Co., 395 So.2d 310 (La.1981). The testimony of the economist is entitled to weight, but, since it is necessarily based on uncertain future events, is not conclusive. A reasonable trier of fact could discount the totals arrived at by the economist to a considerable extent for the reasons discussed above, and perhaps others, but not to the extent necessarily implicit in the $175,000 award. The amount of damages awarded should compensate plaintiff for the difference between his ability to earn immediately prior to the injury and his ability to earn after the injury. Coco v. Winston Industries, Inc., supra. It cannot be doubted that plaintiff's earning capability has been substantially impaired because of the loss of the fingers of his dominant hand.
Viewing the evidence and the calculations of plaintiff's economist in the light most favorable to the defendant as might be found by a reasonable trier of fact, and taking into account the considerations expressed above, we conclude that $200,000 is the lowest figure which could be awarded for loss of earning capacity, past and future. Applying the same approach, we conclude that $75,000 is the lowest award that could have been made for general damages, i. e., pain, suffering, disfigurement, and permanent disability. Crediting *509 the $22,220.85 compensation paid against the total award of $275,000 to which plaintiff is entitled in accordance with the joint stipulation, the judgment should be increased to $252,779.15.
The judgment of the trial court, rendered in accordance with the jury verdict, is amended to increase the award to $252,779.15 and, as amended, the judgment is affirmed. Costs of the appeal are assessed to defendants-appellants.
Amended, and as amended, affirmed.