BARRY, Judge.
Two defendants appeal a judgment in an “executive officer” tort suit[1] and plaintiff answered asserting compensation benefits were erroneously offset and the award was inadequate.
On January 14, 1970 plaintiff was a “spare” assigned as an “anode man” and was injured while attempting to “pull channels” in the pot room at the Kaiser Aluminum plant in Chalmette. The “pots” were electrolyte furnaces in which aluminum ore is reduced to pure aluminum. A “channel” is a 1200 pound piece of metal, “u” shaped, ten inches across and twelve feet long. Channels are attached to the side of the “pot” and, during the process, must be removed (“pulled”) before they melt and lower the aluminum grade. To pull channels two men work as a team: one unbuckles the channels and the other (the plaintiff) does the actual “pulling.” There is no dispute that at least one channel had been pulled prior to the accident and plaintiff was starting to pull channels on the B side of pot 113. The rig, consisting of a Clar-kat [2] and a flat bed trailer holding a red hot channel and two channel pulling motors, had been positioned in front of pot 113. The channel on the rig was still hooked up to the motors by cables. Plaintiff stepped between the Clarkat and trailer to connect the air hose to the air drop that was bolted to pot 113. When he opened the air valve, the right hand channel pulling motor was activated, causing the drum to turn and the cable to wind up, pulling the red hot channel toward the plaintiff, striking him in the back of both legs, pinning him to the Clar-kat. Plaintiff received third degree burns to the calf of each leg resulting in a finding of total and permanent disability.[3]
This tort suit was filed on January 13, 1971 against five Kaiser employees. Service was not requested until September 26, 1973 and defendants’ exceptions of prescription were overruled. On August 21, 1974, Kaiser intervened for paid compensation benefits but on January 28, 1975 dismissed its intervention without prejudice. Discovery revealed the defendants were not insured but that Kaiser’s by-laws provided indemnity to its employees for any loss from claims arising out of employment. As a result, plaintiff filed a supplemental and amended petition adding Kaiser as a defendant. In its answer Kaiser claimed a credit for $19,040.59 paid in compensation benefits.
Trial was held in April, 1980, more than ten years after the accident. A judgment, with written reasons, was rendered on March 24, 1982 in plaintiff’s favor and against Fourroux (the shift foreman and plaintiff’s immediate supervisor) and Kaiser in the amount of $90,894.40 subject to a credit for compensation benefits paid. The other four employees were dismissed.
PRESCRIPTION
Defendants contend that plaintiff deliberately withheld service of process for more than a year and the claim prescribed. The accident occurred January 14, 1970 and suit was filed January 13, 1971 within the one year prescriptive period. Service was not requested until September 26, 1973 and was accomplished October 2, 1973. While we do not condone any effort to thwart the orderly and timely flow of litigation, the filing of suit interrupts prescription: ser *1329 vice and citation within the period is not essential. LSA-R.S. 9:5801, Schrader v. Coleman E. Adler & Sons, 225 La. 352, 72 So.2d 872 (1954); King v. American Motorists Insurance Co., 295 So.2d 26 (La.App. 4th Cir. 1974); Kachelmyer v. Ames, 335 So.2d 525 (La.App. 1st Cir.1976).
NEGLIGENCE OF EXECUTIVE OFFICER
Defendants contend the criteria for imposing individual liability on an “executive officer” as set out in Canter v. Koehring Co., 283 So.2d 716 (La.1973) are not satisfied in this case. They assert the trial court’s finding that Fourroux negligently and improperly attempted to repair the channel pulling motor before the accident is manifestly erroneous and not supported by the evidence.
Plaintiff’s witnesses all testified the equipment had been repaired and plaintiff confirmed the spring was not broken when he used the motor to pull the channel shortly before the accident. Thus, defendants argue the most likely explanation is that the spring broke after plaintiff pulled the channel. That being the case, Fourroux could not have been negligent in causing the spring to break or in failing to discover the broken spring. It is also their position Fourroux had no obligation to make such a discovery, that it was “the man using the equipment who has the continuous obligation to see to it that the equipment is functioning properly.” We disagree.
Canter, supra, at p. 721 provides the following standard relative to executive officer liability:
1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances — whether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff’s damages. If the defendant’s general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm.
See also Pisciotta v. Allstate Insurance Co., 385 So.2d 1176 (La.1980) (on rehearing); Lytell v. Hushfield, 408 So.2d 1344 (La.1982).
To determine whether Fourroux is liable to the plaintiff under the Canter criteria we must examine the specific facts of this case.
The employer, Kaiser, owed a duty to provide its employee, plaintiff, with a reasonably safe place to work.[4] This in- *1330 eludes equipment used to perform that work. That duty was delegated by Kaiser to the shift foreman, Fourroux, giving him the daily responsibility to see that employees had a safe place to work, including the equipment. We believe this finding was clearly established by every witness in a supervisory position in the pot room. Cook, the pot room superintendent, Given, a temporary shift foreman, Hitch, the line foreman and Fourroux’s immediate supervisor, and even Fourroux testified that each day prior to the beginning of a shift, the shift foreman going off, along with the general (or line) foreman and the shift foreman going on would “walk the line” together. The purpose was to check out the line and equipment and to be advised by the previous shift foreman of any problems. Cook explicitly stated the purpose was to determine if the equipment was in safe and operating condition. Fourroux admitted his duties included the safety of his men and the equipment. Any trouble with equipment encountered by the workers was reported directly to him, the shift foreman, who was responsible for calling maintenance to make all repairs. Hence, Four-roux had a personal duty toward plaintiff that had not been delegated to anyone else.
Finally, we must determine if Four-roux breached this personal duty to plaintiff through his own “personal fault” and if this breach specifically caused plaintiffs injuries. As we noted, Fourroux was delegated daily responsibility to insure plaintiff safe working conditions and equipment. There is ample evidence for the Trial Judge to have concluded the right channel pulling motor was not in proper condition and that Fourroux knew or should have known of the particular defect and failed to take prudent action to remedy the hazardous situation. The testimony of Givens, the previous shift foreman, and Noland, the anode man on the previous shift, reveals the defect was discovered on the previous shift. We have no basis to assume the routine practice where the three foremen walked the line and discussed equipment problems prior to the new shift did not occur on this occasion.
There was also testimony by plaintiff and his partner, Aydell, that they called Four-roux to inspect the motor before they used it that day. Plaintiff: “Something was wrong with the right hand motor—the safety guard was bent against the valve.” Ay-dell: “Something was bent. .. . We couldn’t use it.” Plaintiff also testified that Fourroux, instead of calling maintenance to repair the motor (as required by Kaiser), got a wrench and attempted to fix the problem. Not only was this negligence, but as the Trial Judge pointed out, it violated “company policy and the compact between the union and Kaiser.”
Following the criteria in Canter, supra, and for the above reasons we feel it is clear that Fourroux was an executive officer and liable.
Fourroux was responsible for plaintiff’s safety. The totality of the evidence leads us to conclude that Fourroux was either aware or should have been aware that a dangerous condition existed and needed repair. He negligently failed to take appropriate action to correct the hazardous condition thereby depriving plaintiff of a protection owed to him by his employer. We find the risk of harm from the breach of this duty was reasonably foreseeable. Thus, Fourroux’s breach (imposed by the employment relationship) is actionable negligence because it created or maintained an unreasonable risk of harm. Johnson v. Schneider, 271 So.2d 579 (La.App. 1st Cir.1972), Payton v. Travelers Ins. Co., 373 So.2d 1324 (La.App. 4th Cir.1979) writ denied 377 So.2d 119 (La.1979).
CONTRIBUTORY NEGLIGENCE
Defendants argue it is logical to assume the spring broke spontaneously without the knowledge of plaintiff or Fourroux, and alternatively, the spring broke on the prior shift and was broken when plaintiff *1331 first used the equipment and he was con-tributorily negligent. While there was testimony indicating the spring broke on the prior shift, there was no evidence that the lever malfunctioned when Taranto and his partner Aydell pulled the channel before the accident. To the contrary, both plaintiff and Aydell testified the motor was fixed and tested after it was reported to Fourroux and worked on. Also, both stated it operated properly when they pulled the channel on the rig. Contributory negligence is subject to the manifest error standard of review and the evidence does not support that conclusion.
LOST WAGES
Defendants argue plaintiff quit his job voluntarily, for personal reasons, and is not entitled to lost wages because “he was paid those wages while ill, could have remained on the job had he so chosen and would even today, unless laid off for other reasons, be employed by Kaiser with the same wages as everyone else in his classification.” Plaintiff counters he was forced to quit because of being assigned work beyond his capacity and the company doctor pressured him to return to the pot room.
There is.some evidence plaintiff was pressured by Kaiser. He stated he wasn’t able to do all the jobs assigned. For example, at one point he was assigned to steam bathrooms with jet steam machines. He said he was unable to do this because his legs were sensitive to heat. He also testified he couldn’t perform the allotted jobs because he was favoring his left leg. This irritated his right leg, kept him off-balance, and eventually created lower back problems. When he complained to first aid he was told it was nothing and Dr. Wolfe (the plant doctor) told him he was ready to go back to his regular job. There was some evidence plaintiff had personal problems which might have entered in his decision to leave New Orleans for Houston where he became a deer guide.
As stated earlier, this Court found plaintiff totally and permanently disabled.[5] The evidence clearly shows his earning capacity was reduced by this injury. Plaintiff received his last pay in October, 1971. Since then he worked as a deer guide, returned to New Orleans and tended bar, and since 1976 has been a process server with the St. Bernard Sheriff’s Office. Plaintiff did not have his tax returns prior to 1976, but he did for 1976, 1977, 1978. In those years he earned $6,637.84, $6,464.92, $8,248.00. He estimated his earnings for 1979 would be between $15,000 and $16,000. At the time of trial he was earning $775 per month. An “anode man,” on the other hand, was earning $9.73 per hour or in the neighborhood of $1,686.53 per month.[6] Plaintiff also testified an anode man would have made $13,-548.36, $14,908.68, $16,761.96 for those years. The figures presented by defendants’ witness, Mr. Nunnery, were roughly the same. The totality of evidence does not indicate the Trial Judge abused his discretion in awarding $28,394.40 for lost wages.
PLAINTIFF’S ANSWER
Plaintiff claims the amount awarded for pain and suffering should be increased from $10,000 and we agree. We are concerned with obviously severe third degree burns which were excrutiating. Plaintiff went through three surgical procedures (including skin grafts from his stomach) and was hospitalized approximately thirty days. For six weeks he wore a cast from his waist down both legs, then used a wheelchair and crutches. Clothing irritated the grafted areas which remain sensitive to any form of heat (sun, hot water). Recovery was slow, very painful, and his daily activities and lifestyle will be affected for years.
Even though the Trial Judge has much discretion in setting quantum, $10,000 for this traumatic experience is indeed paltry *1332 and should be increased to $50,000, which is adequate though the lowest amount that should be awarded to this particular plaintiff for this particular injury. Reck v. Stevens, 373 So.2d 498 (La.1979). The sum of $7,500.00 was awarded for scars and disfigurement which is low, but adequate.
Finally, plaintiff submits the credit given to Kaiser for paid compensation should not be allowed. He asserts Four-roux didn’t pay this money nor was he obligated to do so. Kaiser was sued as indemnitor of its executive officers, but was self-insured and paid the following compensation benefits:
Medical expense $ 3,089.59
Weekly compensation 1,451.00
Compromise settlement 14,500.00
TOTAL: $19,040.59
The employer is entitled to recover from negligent third parties the compensation actually paid. LSA-R.S. 23:1101. This right to reimbursement of compensation actually paid takes preference over the claim of the employee. LSA-R.S. 23:1103. The purpose of this apportionment is to prevent double recovery by an employee for the same element of his damages. The employer will not be reimbursed for any items which the employee did not recover from the third person. Fontenot v. Hanover Insurance Co., 385 So.2d 238 (La.1980). However, no medicals were awarded by the Trial Judge and this amount is not recoverable by the employer and cannot be offset.
Accordingly, the judgment of the trial court is amended to increase the award for pain and suffering from $10,000.00 to $50,-000.00 and to add $3,089.59 for medical expenses to the net award. In all other respects, the judgment is affirmed.
AMENDED AND AFFIRMED.

. The accident occurred prior to the 1976 amendment by Act 147 to LSA-R.S. 23:1032 which limited civil suits against “executive officers” to injuries arising from “intentional” acts.

. A Clarkat is a motorized vehicle, similar to a forklift without the lift or a golf cart, which is driven by the worker and used to pull the trailer containing the motors and pulled channels.

.Taranto v. Kaiser Aluminum & Chemical Corporation, 280 So.2d 403 (La.App. 4th Cir.1973).

. LSA-R.S. 23:13 provides: Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of *1330 such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees. Nothing in this Section shall apply to employment in private domestic service or to agricultural field occupations.

. Footnote 3, supra.

. This figure is calculated on the base hourly rate and does not reflect variables, such as the hourly rate increases due to the type of shift worked, the number of Sundays (time and a half) and shift premiums (whenever the work week is not a Monday to Friday week) — all of which would increase the salary.