460 So.2d 1106 (1984)
Gradis L. CUTCHALL, Plaintiff-Appellee,
v.
GREAT AMERICAN PUMP COMPANY, et al., Defendants-Appellants.
No. 16536-CA.
Court of Appeal of Louisiana, Second Circuit.
December 5, 1984.
Rehearing Denied January 4, 1985.
*1108 Sockrider, Bolin & Anglin, Shreveport, and Bolin, Elkins & Pearce by James E. Bolin, Minden, for plaintiff-appellant Gradis L. Cutchall.
Mayer, Smith & Roberts by Alex F. Smith, Jr., Shreveport, for defendants-appellants Great American Pump Co. and Canal Indem. Co.
Bodenheimer, Jones, Klotz & Simmons by Harry D. Simmons, Shreveport, for defendant and third party plaintiff-appellee Remmele Engineering, Inc.
Lunn, Irion, Switzer, Johnson & Salley by Jack E. Carlisle, Jr., for defendant-appellees Duggan Mach. Co., Duggan Equipment, Inc. and Royal Ins. Co.
Cook, Yancey, King & Galloway by Sidney E. Cook, Jr., Shreveport, for intervenor-appellee Aetna Cas. and Sur. Co.
Before HALL, MARVIN and SEXTON, JJ.
SEXTON, Judge.
Plaintiff's suit was precipitated by his injury in the course and scope of his employment *1109 as a derrickman on a drilling rig owned by Jett Drilling Company, a subsidiary of Transcontinental Drilling Company. His injury occurred as he was performing a maintenance function on one of the rig's mud pumps which circulate the drilling mud into the hole to lubricate the drill bit. While engaged in this maintenance procedure, plaintiff's hands were crushed by one of the mud pump's reciprocating pistons. As a result of this incident, plaintiff's little finger on his left hand was amputated; his index finger and thumb of his dominant right hand were crushed; and his thumb, after reconstructive surgery, was left in an angulated position. Eventually, his right index finger was also removed.
Cutchall instituted suit against Great American Pump Company, designers of the mud pump, and Remmele Engineering, Inc., the company who manufactured the pump pursuant to a contract with the Great American Pump Company and in accordance with Great American Pump Company's plans and specifications. Plaintiff proceeded against these defendants on the theory that they were strictly liable as manufacturers of the mud pump which was unreasonably dangerous in normal use. Alternatively, plaintiff sought to recover against these defendants on the basis of negligence. Plaintiff also named as defendants Duggan Machine Company, Inc. and Duggan Equipment, Inc., who, as a subcontractor to Bovard Supply, Inc., assembled the entire drilling rig for delivery to Transcontinental Drilling Company as part of a package deal.
Also made defendants were Sentry Insurance, the liability carrier for Remmele Engineering, Inc.; Canal Indemnity Company, the liability insurer of Great American Pump Company; and Royal Insurance Company, the liability carrier for Duggan Machine Company, Inc. and Duggan Equipment, Inc.
Aetna Casualty and Surety Company filed an intervention as the workers' compensation insurer of plaintiff's employer, seeking to recover worker's compensation benefits and medical expenses paid to and on behalf of plaintiff.
All defendants answered plaintiff's suit and denied liability. Alternatively, all defendants pled contributory negligence and/or comparative negligence on the part of the plaintiff.
The case was tried by jury. At the conclusion of plaintiff's evidence, the trial court granted a motion for directed verdict on behalf of Duggan Machine Company, Inc. and Duggan Equipment, Inc. The jury returned a verdict in favor of plaintiff and against Great American Pump Company and Canal Indemnity Company in the amount of $425,000. The jury found that Great American Pump Company was guilty of negligence assessed at ninety percent and that plaintiff, Gradis L. Cutchall, was guilty of negligence assessed at ten percent. Aetna Casualty and Surety Company, intervenor, was recognized in the judgment entered on the jury's verdict to be entitled to a reimbursement of the worker's compensation benefits and medical expenses paid to and on behalf of plaintiff. Remmele Engineering, Inc. was absolved of liability by the jury.
Great American Pump Company and its insurer have appealed. Plaintiff has likewise appealed the jury verdict. Remmele and its insurer; Duggan Machine Company, Inc. and Duggan Equipment, Inc. and their insurer; and Aetna, the worker's compensation carrier and intervenor, have answered the appeal.

The Liability of Great American Pump Company
Appellant, Great American Pump Company contends that the jury erred in its conclusion that plaintiff proved by a preponderance of the evidence that the mud pump was unreasonably dangerous in normal use. Alternatively, they assert that the jury erred in finding that plaintiff's injuries were caused by the defective mud pump, as opposed to his negligence. We will initially address appellant's claim relative to the sufficiency of evidence adduced to support plaintiff's claims. Thereafter, we will turn *1110 to the issue of whether negligence under these circumstances may be compared.
A manufacturer of a product that involves a risk of injury to the user is liable to any person whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the product, which injury might reasonably have been anticipated. However, the injured plaintiff bears the burden of proving that the product is defective, or unreasonably dangerous in normal use, and that his injuries were caused by the product's normal or intended application. Weber v. Fidelity and Casualty Insurance of New York, 259 La. 599, 250 So.2d 754 (1971).
Therefore, it follows that a product is defective under Louisiana law if the product is unreasonably dangerous. "Unreasonably dangerous" means simply that the product which injured plaintiff was dangerous to an extent beyond that which would be contemplated by an ordinary user. Hebert v. Brazzel, 403 So.2d 1242 (La.1981); DeBattista v. Argonaut-Southwest Insurance Company, 403 So.2d 26 (La.1981); Braxton v. Georgia Pacific Corp., 419 So.2d 125 (La.App. 2d Cir.1982), writ denied, 423 So.2d 1150 (La.1982).
If the product is proven defective by reason of its hazard to normal use, plaintiff need not prove any particular negligence by the maker in its manufacture or processing, as the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them. Weber, supra.
The mud pump in question is a duplex pump, meaning it has two operational piston rods. On each side of the pump is a cavity which houses the workings of the piston wash system. The piston wash system lubricates and cools the piston rods which reciprocate up to 70 times per minute. As the piston rods stroke continuously, an uninterrupted flow of lubricant is required. The absence of the lubricant causes the piston to smoke as a result of the heat it generates by its movement. A smoking piston rod indicates to the derrickman that the pump needs immediate attention.
The hose which conducts the lubricating fluid to the piston rod is, under normal circumstances, inserted into a hole in the circumference of the packing nut, also referred to as the gland nut. The gland nut is attached to the piston rod. In a horizontal line, the piston rod strokes between the gland nut and the jam nut, which separates the piston rod from the larger pony rod. The distance between the top of the gland nut where the hose is inserted and the piston rod below is approximately five inches.
On the occasion of his injury, plaintiff noticed smoke emanating from the mud pump. He then attempted to reinsert the disengaged lubricating hose into the appropriate hole on the gland nut. This process required that plaintiff assume a crouching position on the metal skid or platform on which the mud pump rested, and insert one or both hands into the cavity containing the reciprocating rod. While in this position, plaintiff lost his balance and slipped, causing his hands to be thrust downward into the path of the operating piston. Mr. Cutchall's fingers were amputated and his hands crushed by the reciprocation of the piston rod, which pinned his hands between the gland nut and the jam nut.
Plaintiff contends that the design of the piston wash system which necessitates the manual insertion of the lubricating hose into the gland nut only five inches above the piston and while the pump is in operation, constitutes a defect in the mud pump which renders it unreasonably dangerous in its normal and intended usage. In special interrogatories, the jury found that Great American Pump Company was liable for plaintiff's injuries. Implicit in their verdict was the finding that the mud pump in question, by virtue of the design of its piston wash system, was defective. We agree.
The hose through which the lubricant flowed was approximately 5/8ths of an inch in diameter. The corresponding hole in the *1111 gland nut was approximately 1/8th of an inch larger. Dr. Percy Miller, plaintiff's expert, testified that the vibration of the 550 horsepower engine, coupled with the reaction velocity, or backward force created by the flowing liquid, caused the hose to naturally become disengaged from the hole. Plaintiff testified that in this particular pump, the hose had a tendency to come out of the hole. Two other witnesses verified this fact. William Harkins, who was a derrickman on the same rig as Cutchall but who worked on another shift, testified that the hose disassociated itself from the hole from five to ten times during an eight-hour shift. He also testified that he had had a near miss with the pump where his fingers brushed against the operating piston rod while he was replacing the hose.
The pump's designer, Jack Amerman, Sr., testified that he was aware that this hose would have to be manually inserted by a worker while the pump was running; that he expected that the derrickman would have to handle this hose once or twice a day; and that at the time he designed the pump he knew that hand injuries had occurred in this area of the machine, although he did not know if they were specifically caused by the pump's piston wash system. Mr. Amerman testified that Great American Pump Company never performed any safety testing for the piston wash system of the pump nor did they request that Remmele perform these tests.
Plaintiff also adduced expert testimony that alternate piston wash system designs existed at the time of the design of the instant pump, and that the manufacture of a pump implementing one of these alternate designs would cost the same as or less than the cost of manufacturing the pump in question. One of the designs utilized a permanently fixed hose for transporting the lubricant to the piston rod; the other made use of a quick coupling retention device which held the hose in the hole securely. Both of these designs eliminate manual hose insertion.
While the law does not require that the manufacturer make a "foolproof" or "accident proof" product, it does require the manufacturer to exercise reasonable care in the design and fabrication of its products which are of a nature that, if not carefully made, can cause foreseeable injury to persons using the product for purposes which the manufacturer may reasonably expect them to be used. Leathem v. Moore, 265 So.2d 270 (La.App. 1st Cir. 1972); Gauthier v. Sperry Rand, Inc., 252 So.2d 129 (La.App. 3rd Cir.1971).
We find that plaintiff has proven by a preponderance of the evidence that the mud pump was defective, i.e., that it was unreasonably dangerous while engaged in its normal or intended usage. Plaintiff has also sufficiently proved that his injuries resulted from the unreasonable risk posed by this mud pump. The jury verdict was correct insofar as it found defendant Great American Pump Company liable to plaintiff for his injuries.
Having thus concluded, we now focus on whether plaintiff, as a matter of law, was negligent to an extent that would reduce his recovery. The issue then, is whether defendant owes a legal duty to plaintiff and, if so, whether that duty extends to the particular risk encountered by this particular plaintiff. Stated differently, the present inquiry is whether the risk encountered by plaintiff fell within the ambit of the manufacturer's duty to produce a mud pump which is not unreasonably dangerous in normal use.
In this regard, we note that the harm which befell plaintiff is easily associated with the risk created by the manufacturer's design of this mud pump. The record reflects that as part of his duties plaintiff was required to maintain these mud pumps. The smoking mud pump indicated an interrupted flow of lubricant to the piston rods, portending potentially serious consequences. Of necessity, and as part of plaintiff's job responsibilities, he was required to rapidly cross the metal skid and reinsert the loosened hose only five inches above the operating pistons, while the machine leaked the slippery drilling mud. His refusal or failure to quickly perform this *1112 function could cause serious complications and possibly jeopardize the drilling operation of his employer. Inherent in plaintiff's testimony and that of the other derrickman who testified that they were responsible for the maintenance of the mud pumps was the inference that they had to reinsert the hose and correct the problem or lose their job.
A workman, in a suit against the executive officers of his employer, is not held to be negligent when he works under dangerous conditions for which his employer is responsible and at which assignment he must work or suffer dismissal. Brown v. White, 430 So.2d 16 (La.1982); Wilson v. Aetna Casualty and Surety Company, 401 So.2d 500 (La.App. 2d Cir.1981); Payton v. Travelers Insurance Company, 373 So.2d 1324 (La.App. 4th Cir.1979), writ denied, 377 So.2d 119 (La.1979); Coco v. Winston Industries, Inc., 330 So.2d 649 (La. App. 3rd Cir.1976), reversed as to quantum, 341 So.2d 332 (La.1976). This fear of losing a job because one is a complainer is a realistic fear of an employee who is assigned daily to perform tasks which necessarily involve a degree of danger because of the nature of the job. Brown, supra.
Here, we are concerned with the jury's verdict finding plaintiff ten percent at fault as compared to the pump manufacturer, not the employer, being ninety percent at fault. The negligence of the employer or of an executive officer of that employer is not at issue, although plaintiff's employer demanded that the hose be reinserted without stopping the pump.
However, in this instance, the plaintiff derrickman is legally situated much in the same predicament as was the workman in Brown. The pump manufacturer was aware of and anticipated the necessity of manual reinsertion of the hose while the pump was in operation. Additionally, Great American Pump was aware of the demands made by drilling rig employers on its employees relative to this maintenance function. What might be characterized as unreasonable conduct in other circumstances becomes reasonable in these circumstances even as against the pump manufacturer. The defendant pump manufacturer was aware of, and expected, the fact that it would be necessary, several times during the workday, for a derrickman or other rig worker to have to reinsert the hose without stopping the operating pump. The derrickman's "realistic fear" of losing his job if he failed to take this risk, renders the conduct of the derrickman reasonable and, therefore, not negligent under the circumstances. See Brown, supra.
We therefore find as a matter of law that the fact finder was clearly wrong under the circumstances of this case in reducing plaintiff's award as a result of negligence found on the part of the plaintiff. We are cognizant that in so doing, we have pretermitted the broad issue of whether fault, in products liability litigation, may be compared. We simply hold that in the instant case, as a matter of law under the facts of this case, plaintiff's recovery may not be reduced by a percentage attributable to his own fault.

The Liability of Remmele Engineering, Inc.
Remmele Engineering custom-built the mud pump according to the plans and specifications of Great American Pump Company. With respect to this defendant, plaintiff claims that Remmele should be held liable to plaintiff under the recent pronouncement of Brown, supra. Brown held that a manufacturer cannot be held negligent when it has no part in the design of a system, when it is the system design which presents dangerous risks to the employees, unless the danger is or should be apparent to the manufacturer.
The jury was instructed in accordance with the holding of Brown. Inherent in their verdict absolving Remmele of legal responsibility is the determination that under that standard, the danger was not, in this instance, apparent to Remmele. The finder of fact was not clearly wrong in this determination, and may not be reversed on *1113 appeal absent manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).

The Liability of Duggan
Plaintiff asserts that the trial court erred in granting a directed verdict as to Duggan.
Jack Jerome, an officer of Duggan, testified that Duggan became involved in the assembly of the rig at the request of Bovard Supply Company. Bovard is a large oil field equipment supplier, who purchases machinery from various manufacturers and then resells these products to its customers. In order to build the new drilling rig, Transcontinental Drilling contacted Bovard Supply Company to furnish the equipment for the rig. Bovard, in turn, contacted Duggan to fabricate some of the structural components of the rig and to supervise and assist Transcontinental in the assembly of the rig.
Jerome testified that the fact that a Great American pump was incorporated into the rig was the result of one of two reasons: Transcontinental specifically requested a Great American pump from Bovard; or Bovard had a Great American pump in stock and made that particular pump available to Transcontinental. Jerome stated that Duggan had nothing to do with the assembly of the mud pump, neither did the company alter, reassemble, or repair this particular pump.
Thus, the record reflects that Duggan acquired various major parts of the rig, such as the mast, the rotary table, the swivel, and the mud pumps from Bovard. Duggan furnished other major parts, such as the draw works and the mud tanks. Using its own steel, pipes, and labor, Duggan assisted Transcontinental in assembling all of these parts into a complete drilling rig.
Plaintiff contends that the assembly of these parts into a whole product, the drilling rig, makes Duggan liable as a manufacturer within the meaning of Spillers v. Montgomery Ward & Company, Inc., 294 So.2d 803 (La.1984).
In Spillers, the defendant, G & S Manufacturing, modified plaintiff's truck for the purpose of hauling lumber. In order to do so, they purchased a sixteen year old wheel which was once owned by a junkyard. The tire subsequently exploded, causing serious injury to plaintiff. The court found that G & S was liable to plaintiff, and in so doing, rejected their argument that they did not actually manufacture the wheel and rim.
A manufacturer is no less a manufacturer because his product is composed in part of units manufacturer (sic) by another. Radalec, Inc. v. Automatic Firing Corp. [228 La. 116, 81 So.2d 830 (1955)], supra. The argument made by G & S would be more impressive if it had purchased the wheel and rim new from a maker on whom it was entitled to rely. The failure to inspect for size the sixteen year old wheel, once purchased from a junk yard, cannot fulfill the responsibility of care which the law places on the manufacturer of an object which, if defective, can reasonably be expected to cause injury.
Roberts v. St. Bernard Parish School Board, 427 So.2d 676 (La.App. 4th Cir. 1983), writ denied, 433 So.2d 1053 (La. 1983), recently reiterated the criteria the trial judge must employ in deciding a motion for directed verdict, quoting the federal standard for the rule which is the genesis of the Louisiana directed verdict article, LSA-C.C.P. Art. 1810:
On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidencenot just that evidence which supports the non-mover's casebut in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial *1114 judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.
After reviewing the record in this light, we conclude that the granting of the motion for a directed verdict as to Duggan was proper. Duggan is simply an oil field machine shop and fabrication facility. Duggan provided a location for assembly of the drilling rig and fabricated certain structural components of the rig as a service to its general contractor, Bovard. The pump involved was new, and the record indicates that it was either supplied by Bovard or requested by Transcontinental. We therefore find under the circumstances of this case that Buggan was not a manufacturer within the meaning of Spillers, supra.

Quantum
Plaintiff contends that the jury's award of $425,000 is so inadequate as to represent an abuse of discretion.
At the time of his injury, Cutchall was 28 years old. He is married and the father of two children. In school he attended special education classes. He has an IQ of 76, and is unable to read or write. He has a speech impediment which is the result of a cleft palate, and his hearing is slightly impaired.
Plaintiff had worked in various jobs in the oil industry since he was 18 years old. Before that time, the only other employment he had undertaken was mowing yards.
After a period of recuperation following the accident which occurred in September, 1981, plaintiff went to work in January, 1982 for Lagerson Drilling Company. He was initially employed as a chain man but his injury prevented him from performing this work. He was also unsuccessful in his position as a derrickman and as a driller because of his inability to handle ropes or a brake handle. He was eventually employed by that company as a "dry watcher," one who guards an inactive rig against theft. In December of 1982 he was employed by Nicor Drilling. Once again, he was unable to manipulate the tools necessary to perform satisfactorily.
In connection with his post-accident oilfield employment, Cutchall has twice sustained injury to his right thumb because of its angulated and stationary position. This angulated position leaves the thumb vulnerable to further injury. Moreover, as a result of the accident and treatment, the bones in the thumb are in a constant process of deterioration. The thumb was broken once in January, 1983, when plaintiff was making a connection with drilling pipe and tongs hit the protruding thumb. It was broken again and the pins securing the bone in place became dislodged while plaintiff worked with a breaker bar on a mud pump, and the thumb hit an object.
After reconstructive surgery in which a bone from plaintiff's hip was grafted onto his thumb in February of 1983, plaintiff returned to work for Nicor Drilling in May of 1983. His recurring problems caused him to quit that job and seek employment outside the oil industry.
He obtained employment as a construction worker for Tri-State Construction Company but was unable to carry lumber. From August, 1983 to October, 1983, plaintiff was employed part-time washing cars at a used car lot. His lack of manual dexterity and the pain caused from the cold temperature of the water resulted in his terminating this employment. Since October, 1983, plaintiff has remained unemployed.
Before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused its discretion in making the award. An award made in the trial court may not be modified unless it is unsupported by the record. The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record. Coco v. Winston Industries, Inc., supra; Bitoun v. Landry, 302 So.2d 278 (La.1974); Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971); Winterrowd v. Travelers Indemnity Co., 452 So.2d 269 *1115 (La.App. 2d Cir.1984); Black v. Ebasco Services, Inc., 411 So.2d 1159 (La.App. 1st Cir.1982), writ denied, 414 So.2d 1253 (La. 1982); Greene v. Wright, 365 So.2d 551 (La.App. 1st Cir.1978). Moreover, the appellate function in reviewing quantum is limited to raising inadequate awards to the lowest amount the trial court could have reasonably awarded, and lowering excessive awards to the highest amount the trial court could have reasonably awarded. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., supra; Winterrowd, supra; Alexander v. Leger, 423 So.2d 731 (La.App. 3d Cir.1982); Greene v. Wright, supra.
The appropriate procedure for testing whether the jury abused its discretion by making an excessive award is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the jury. The converse of this rule is also true: in determining whether the trier of fact abused its discretion by making an inadequate award, the evidence must be viewed in the light most favorable to the defendant. Schexnayder v. Carpenter, 346 So.2d 196 (La.1977); Wilson v. Aetna Casualty and Surety Company, supra. Further, we note the cautionary language of Reck v. Stevens, supra, to the effect that an appellate court must reach a determination that the trier of fact abused its discretion before a resort to prior awards is appropriate for purposes of determining what would then be an appropriate award.
In reviewing this unitemized award to determine whether the plaintiff's award is the lowest acceptable amount which the jury could assess on the evidence, we find that plaintiff proved medical expenses in the amount of $25,427.14, which represents his expenses incurred through February 4, 1982. Plaintiff also incurred medical expenses totalling $8,511.66 for treatment after February 4, 1982. Defendants argue that the injuries which precipitated this treatment were caused by subsequent mishaps for which they are not liable. Liability for medical expenses of $8,511.66 is therefore contested. Plaintiff proved lost wages of $30,678.00 from the date of the accident to January 24, 1984, the first day of trial. Subtracting the amount of medical expenses, $33,938.80, and the proven lost wages, $30,678.00 from the total award of $425,000 leaves $360,383.20. We must now determine whether this sum adequately compensates plaintiff for his loss of future wages and general damages.
It is plaintiff's burden of proving that his disability will cause him to suffer a lack of income. Winterrowd, supra; Holmes v. Texaco, Inc., 422 So.2d 1302 (La.App. 5th Cir.1982); Profit v. Linn, 346 So.2d 253 (La.App. 1st Cir.1977). In evaluating plaintiff's evidence, we are to consider his physical condition prior to the accident, his work record, the extent of his earnings, and the probability that he would have earned similar sums in future years except for his disability. Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968).
In order to sustain his burden, plaintiff offered the testimony of two expert witnesses. Dr. Richard Galloway, a vocational evaluation and rehabilitation expert, interviewed plaintiff and testified on his behalf. Dr. Galloway opined that Cutchall would no longer be able to perform oilfield related work because of his injuries, and further opined that Cutchall could not function in the job market except for light janitorial work. Galloway classified plaintiff's future wage earning capacity as that of a marginal minimum wage earner.
Dr. Melvin W. Harju testified on behalf of plaintiff as an expert in economics, finance and calculations of economic loss. Using an inflation rate of 7.5%, and a variable discount rate of 9.5-11.82%, Dr. Harju calculated the present value of plaintiff's future lost wages projected over his expected work life of 28.7 years. In arriving at his total figure for future lost wages, Dr. Harju assumed plaintiff's ability to maintain a minimum wage job and subtracted plaintiff's projected future earnings as a minimum wage earner ($139,869.00) from his future earnings calculated at the *1116 rate he was earning prior to his accident ($563,083.00) to obtain a total of $423,214.00 representing lost wages.
Loss of future earning capacity cannot be calculated with mathematical certainty. Philippe v. Browning Arms Co., 395 So.2d 310 (La.1981); Wilson, supra. As discussed in Wilson, supra, the testimony of an economist is entitled to weight, but since it is necessarily based on uncertain future events, it is not conclusive. The figures arrived at by Dr. Harju could have been discounted by a reasonable trier of fact to account for various factors such as the instability of the oil market. The amount of damages awarded should, however, compensate plaintiff for the difference between his ability to earn immediately prior to the injury and his ability to earn after the injury. Coco, supra; Wilson, supra.
We conclude that $100,000 is the lowest possible award, on the basis of this record and in accordance with plaintiff's particular circumstance, to compensate plaintiff for his general damages. Subtracting $100,000 from the total amount of the award allocated to the compensation of plaintiff for loss of future earnings and general damages leaves $260,383.20. Viewing the evidence and the calculations of plaintiff's economist in the light most favorable to the defendant as might a reasonable finder of fact, we conclude that this figure, while low in view of his limited prospects for future employment, is within the ambit of the jury's discretion.
The judgment of the trial court reflecting the jury's verdict is therefore amended to strike the phrase "less a reduction of 10% for plaintiff's comparative negligence, pursuant to the jury's special interrogatory answer 4," and as amended is affirmed. Costs of this appeal are assessed to defendants-appellants.
AMENDED, AND AS AMENDED, AFFIRMED.
SEXTON, J., assigns additional concurring reasons.
SEXTON, Judge, additionally concurring.
I offer this concurrence even though I am the author because I was unable to convince my brothers of this panel of a) the correctness of the analysis in Frain v. State Farm Insurance Company, 421 So.2d 1169 (La.App. 2d Cir.1982), and b) its applicability to this case with respect to the negligence of the plaintiff.
They contend that under Brown v. White, 430 So.2d 16 (La.1982), (and the other cases cited with respect thereto), that the actions of our plaintiff do not equal negligence. On the other hand, I believe that the plaintiff in Brown (and the other cases) was negligent. I believe that if a system of pure comparative negligence had then been in existence, those plaintiffs would have been assessed a minor degree of negligence. However, because of the severity of contributory negligence, those plaintiffs were simply held not to be negligent.
As I indicated in a footnote in Frain, I agree that pure comparative negligence is better law than that espoused there, but the Legislature did not intend pure comparative negligence. In other words, in my view, the better law is that our plaintiff was negligent to the degree assessed by the jury and that negligence should be compared. However, since the Legislature did not intend pure comparative negligence, I would say that the manufacturer's duty was so great under the circumstances of this case (the slippery deck, rapidly stroking piston, small opening, and necessity for speedy action) as to encompass or obviate plaintiff's negligence. By the clear wording of LSA-C.C. Art. 2323, since comparative negligence is used only "when contributory negligence is applicable," this plaintiff's negligence may not be compared. Frain v. State Farm Insurance Company, supra; Bays v. Lee, 432 So.2d 941 (La.App. 4th Cir.1983); Dulaney v. Travelers Insurance Co., 434 So.2d 578 (La.App. 1st Cir.1983). Johnson, Comparative Negligence and the Duty/Risk Analysis, 40 La.L.Rev. 319 (1980).