488 So.2d 1051 (1986)
Robert D. ORTIGO, Plaintiff-Appellant,
v.
James I. MERRITT and Commercial Union Insurance Company, Defendants-Appellees.
No. 17723-CA.
Court of Appeal of Louisiana, Second Circuit.
May 7, 1986.
*1052 Nelson, Hammons & Johnson by John L. Hammons, Shreveport, for plaintiff-appellant.
Lunn, Irion, Johnson, Salley, & Carlisle by Michael S. Hubley, Shreveport, for defendants-appellees.
Before MARVIN, FRED W. JONES, Jr. and LINDSAY, JJ.
LINDSAY, Judge.
This is a suit for damages arising out of an automobile accident which occurred at an intersection in Bossier Parish. The plaintiff, Robert Ortigo, was the driver of one of the vehicles and defendant, James I. Merritt, was driving the other vehicle involved in the collision. Commercial Union Insurance Company, Merritt's liability insurer, was also made a defendant. The trial court awarded the plaintiff $24,573.30 for general and special damages. This award was reduced to $19,658.64, however, based upon the trial court's finding that the plaintiff was twenty percent at fault in causing the accident. Finding that the trial court erred in apportioning twenty percent fault to the plaintiff, we amend the judgment and affirm.
On August 23, 1982 at approximately 6:00 p.m., the plaintiff was driving a pickup truck south on Swan Lake Road pulling a small utility trailer. The defendant, also in a pickup truck, was traveling west on Shed Road, following another vehicle which was approaching the intersection with Swan Lake Road. When the plaintiff was several hundred feet away from the intersection, traveling between thirty and thirty-five miles per hour, he observed that the signal light facing him was red and he began to slow his vehicle accordingly. As he neared the intersection, he saw the light change to green. He accelerated again to approximately thirty miles per hour and proceeded *1053 into the intersection. At that time, he noted that the car, preceding the defendant's vehicle to his left on Shed Road, was in the process of making a right turn into the northbound lane of Swan Lake Road. After the turning car proceeded through the intersection, the defendant then entered the intersection, whereupon his truck collided with that of the plaintiff. The right front fender of the defendant's truck hit the left front fender of the plaintiff's truck, which caused the defendant's truck to spin and hit the plaintiff's truck in the rear as well.
The plaintiff filed suit against Merritt and his automobile liability insurer one year later. The plaintiff alleged that due to the sole negligence of the defendant driver, he should recover $74,633.08 for his personal injuries and for the damage to his vehicle. One week before trial, the plaintiff filed a supplemental petition seeking an increase in the amount of damages and alleging that subsequent to the initial injuries he received in the accident, he had been diagnosed as suffering from "thoracic outlet syndrome." Due to this disability, the plaintiff alleged that he had to terminate his part-time employment as a contract pumper with Triton Oil and Gas Company.
The trial court, in written reasons, found that even though a preponderance of the evidence indicated that the defendant entered the intersection on a red light, the plaintiff's recovery should be reduced by twenty percent in proportion to his negligence contributing to the accident. The trial court determined that in addition to an award of $2,049.40 for the plaintiff's medical expenses, an award of $9,000 was appropriate for the general damages suffered by the plaintiff, including such elements as pain and suffering, mental anguish and distress. The trial court awarded the plaintiff $6,414.90 for the damages to his truck and $1,500 for lost commissions in connection with the use of his truck for his primary job as a sales manager with P & L Implement Company. The court also awarded the plaintiff $4,709 for the loss of his part-time employment with the Triton Oil and Gas Company.
The plaintiff on appeal relies upon four specifications of error which raise the following issues for our consideration: whether the trial court erred in apportioning twenty percent of the fault to the plaintiff; whether the trial court accorded the proper weight to the opinions of the physicians who examined the plaintiff and who testified by deposition; whether the trial court awarded the plaintiff an adequate sum as general damages; and whether the trial court awarded the plaintiff an adequate sum for the loss of his wages in connection with his part-time employment.
In their answer to the plaintiff's petition, the defendants alleged that the plaintiff was guilty of negligence for failing to keep a proper lookout and for failing to take proper precautions to avoid the accident.
Comparative negligence is used to determine the damage award that is available for each party when each party is found to have some degree of fault. A trier's findings as to percentages of fault are factual and, in the absence of clear or manifest error or an abuse of discretion, must be upheld on appeal. Triangle Trucking Co. v. Alexander, 451 So.2d 638 (La.App. 3rd Cir.1984).
The law of comparative negligence will be applied when both drivers are found to be negligent. Rome v. State Farm Mut. Auto. Ins. Co., 439 So.2d 1253 (La. App. 5th Cir.1983). However, the drivers must first be found to be negligent.
Benoit v. Hartford Casualty Insurance Company, 478 So.2d 707 (La.App. 3rd Cir. 1985), writ denied 480 So.2d 745 (La.1986).
In the instant case, the trial court, after reviewing the report of the police officer who investigated the accident which was submitted into evidence, and the testimony of both the plaintiff and the defendant, apportioned the fault between the parties at eighty percent to the defendant driver and twenty percent to the plaintiff. However, after a careful review of the record, we find that the trial court was clearly wrong in assigning any percentage of fault *1054 to the plaintiff. It is evident from the record that the defendant did not uphold his burden of proving that the plaintiff, in approaching and entering the intersection, was negligent.
In Jones v. Winston, 437 So.2d 889 (La. App. 2d Cir.1983), this court discussed the duties of motorists approaching an intersection controlled by semaphore signals, stating:
A driver entering an intersection controlled by a semaphore light system must pay attention to the light facing him. Bryant v. Ouachita Coca-Cola Bottling Company, 239 La. 83, 117 So.2d 919 (1960). The duty of a motorist at an intersection controlled by a signal when the indicator light facing him is green was stated by this court most recently in McCoy v. Chambers, 403 So.2d 838 (La. App. 2d Cir.1981): "`A motorist approaching an intersection controlled by semaphore signals, who is favored by a green light, is entitled to assume that traffic approaching the intersection from either side on a red light will comply with the red light and respect his right of way.... The favored motorist is not obligated to look to his left or right before entering the intersection.... and will be held accountable only if he could have avoided the accident with the exercise of the slightest degree of care and fails to do so.... All that is required is that the favored motorist maintain a general observation of the controlled intersection....'" See also Champagne v. McDonald, 355 So.2d 1335 (La.App. 3rd Cir.1978).
In McCoy, supra, we also noted that even though a motorist on a favored street has the right to assume that a driver approaching on a less favored street will yield the right-of-way, "once he sees or should have seen that the other car will not observe the law, he must exercise reasonable care to avoid a collision. Burns v. Dominique, 354 So.2d 763 (La.App. 4th Cir. 1978)."
The defendants in the instant case argue that the plaintiff failed to maintain a proper lookout when approaching and entering the intersection and that he did not take any evasive action to avoid the collision. The trial court agreed with the defendants' contention stating that "plaintiff was not as attentive as he should have been when entering the intersection." However, based upon the evidence and testimony adduced at trial, that conclusion is clearly incorrect.
The police report which was submitted into evidence in lieu of the investigating officer's testimony, revealed that the speed limits for both Swan Lake and Shed Roads were thirty-five miles per hour. The report indicated that the estimated speeds of both vehicles at the time of the collision were below the posted limits. The diagram included in the report was incorrect; however, this was noted and corrected at trial. The report further indicated that the plaintiff was entering the intersection on a green light when he was hit by the defendant's truck and that the defendant, following the vehicle in front of him, proceeded into the intersection without looking at the light.
The plaintiff testified that he was watching the signal light controlling his lane of travel and that when it changed to green, he accelerated to an appropriate speed of thirty to thirty-five miles per hour and proceeded into the intersection. He did observe, just prior to entering the intersection, that a car to his left on Shed Road was making a right turn, but he stated that he did not see the defendant's vehicle until the collision. He stated that he was a "little past the light" when the accident occurred and that it appeared that the defendant had attempted to turn left to avoid hitting the plaintiff's vehicle, as the defendant's vehicle spun around and hit the rear of the plaintiff's vehicle.
The defendant testified that he had glanced at the signal light "moments before" he entered the intersection and that it was green. He stated, however, that when the car in front of him proceeded into the intersection, he just followed without *1055 checking the light again, and then collided with the plaintiff's truck.
On the basis of this evidence, we cannot agree with the trial court's finding of fact that the plaintiff was negligent. Mr. Ortigo was attempting to travel through the intersection on a favorable green light. The defendant did not produce any evidence to rebut the plaintiff's testimony or to contradict the police report on this fact. The plaintiff maintained a proper lookout and exercised ordinary care as he approached and entered the intersection, noting that the car to his left was making a right turn. His view of the defendant's vehicle would necessarily have been obstructed by, or at least directed toward, this turning vehicle. There was no evidence presented at trial to indicate that Mr. Ortigo could have or should have been alerted to the fact that the defendant, inattentively following the car in front of him, would violate the control signal facing his lane of travel and fail to yield the right-of-way. Therefore, Mr. Ortigo could not have been expected to take any evasive action prior to the collision, based on these circumstances. In light of the jurisprudence, although the plaintiff did not see the defendant's truck due to the turning car, as a favored motorist, the plaintiff was only required to maintain a general observation of the controlled intersection. Therefore, that portion of the trial court judgment holding that the plaintiff was twenty percent at fault is amended, as we find that the plaintiff was free of any negligence.
The plaintiff next contends that the trial court erred in awarding an inadequate sum for general damages to compensate him for the injuries he received in this automobile accident. Included in this argument is the plaintiff's contention that the trial court failed to accord the proper weight to the medical opinions of the plaintiff's "treating physicians," as opposed to the opinion of the physician hired by the defendants to make an independent medical evaluation of the plaintiff before trial.
In Pringle v. Williamson Chevrolet, Buick & Pontiac, Inc., 480 So.2d 929 (La. App. 2d Cir.1985) this court stated:
Before an appellate court can disturb an award made by a trial court the record must clearly reveal that the trier of fact abused its discretion in making the award to the plaintiff. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976); Cutchall v. Great American Pump Company, 460 So.2d 1106 (La. App. 2d Cir.1984).
LSA-C.C. Art. 1999, stating the principle formerly contained in LSA-C.C. Art. 1934(3), reveals "When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages."
After a review of the testimony and evidence, we do not find the trial court abused its much discretion in awarding $9,000 to the plaintiff for general damages. It is noted that all of the medical testimony presented to the court was introduced in deposition form. Other medical evidence included physicians' reports, bills and a record of the plaintiff's hospital stay in August of 1983. Mr. Ortigo, his wife and his father also testified concerning the plaintiff's physical condition following the accident.
As discussed by this court in Ramphrey v. Highlands Insurance Company, 406 So.2d 691 (La.App. 2d Cir.1981), the fact that the testimony of some or most of the witnesses was taken by deposition does not take away from the much discretion accorded to the trial court in fixing the amount of damages.
As an appellate court, our standard of review of the trial court's findings of fact with respect to the extent of the plaintiff's injury, was succinctly set forth in F & S Offshore, Inc. v. Service Machine and Ship Building, Corp., 430 So.2d 1167 (La. App. 1st Cir.1983) where the First Circuit Court of Appeal stated:
In the instant case, the record is made up of testimony taken in court in the presence of the trial judge and depositions of witnesses taken out of his presence. *1056 In evaluating the testimony adduced in open court, we must follow the rules enunciated in Canter and Arceneaux because the trial judge is in a better position to evaluate the credibility of the witnesses (as compared with an appellate court's access only to a cold record). However, where a trial judge relies on the deposition of a witness, the rules of Canter and Arceneaux do not apply because the trial judge is in no better position to assess credibility than an appellate court. [Citations omitted.] When evaluating depositions, rather than live testimony, we must determine the sufficiency and preponderance of the evidence. Blue Streak Enterprises v. Cherrie, 263 So.2d 734 (La.App. 4th Cir. 1972).
Based upon our review of the depositions and the medical evidence presented, we find that the trial court's determination as to the extent of plaintiff's injuries was an accurate reflection of the preponderance of the evidence in this case. Our review of the trial court's conclusions with respect to the trial testimony in this case also indicates that his assessment of the plaintiff's condition was not clearly wrong.
The plaintiff did not seek medical attention for any injuries immediately following the accident. At trial, however, he testified that the impact of the collision caused him to be thrown against the door to his left, whereupon he sustained bruises to his left shoulder. He stated that his left shoulder and arm remained stiff and sore. Because his discomfort increased, the plaintiff first sought medical attention eight months after the accident. He saw Dr. Ragan Green, Jr., an orthopedic surgeon on May 2, 1983, August 11, 1983 and was admitted to Willis-Knighton Medical Center by Dr. Green on August 16, 1983. Dr. Green's admitting report stated that his office examinations of the plaintiff had revealed some weakness in the plaintiff's left arm and that he should undergo a repeat EMG and cervical mylogram to rule out any possibility of nerve root irritation or brachial plexus palsy. These tests would rule out any cervical disc problems as well. Apparently, the plaintiff had previously undergone an EMG administered by Dr. Moufarrej in May of 1983. Dr. Moufarrej also administered the EMG and performed nerve conduction studies while the plaintiff was hospitalized in August, 1983.
Dr. Green's summary report after the plaintiff was discharged from Willis-Knighton Medical Center on August 20, 1983 indicated that the EMG and cervical mylogram which were performed were read as negative. He stated that although his examination of the plaintiff revealed a questionable weakness of his triceps, the neurological examination was otherwise unremarkable. His impression of the plaintiff's ailment was "cervical strain and paresthesia of the left arm, etiology unknown."
The plaintiff testified that when he continued to experience intermittent weakness, numbness, tingling and pain in his left arm, he sought further medical treatment from Dr. James Bruner, a cardiovascular and thoracic surgeon. Dr. Bruner, in his deposition taken May 17, 1984 stated that he examined the plaintiff on December 6, 1983. He stated that his physical examination revealed that there was no evidence of any swelling or bruit in the brachial plexus or parascapular location, which would have indicated a pinched nerve or a compression of the artery in that area. Dr. Bruner also checked the plaintiff's hand grasp strength and noted a significant difference of about forty-five pounds, indicating a greater weakness in the plaintiff's left arm. The plaintiff's tendon reflexes were normal and there was a depression of light touch in the pin prick testing of the fingers of the plaintiff's left hand.
Tests were also performed to determine whether there was a compression of the neurovascular bundle at the thoracic outlet. Dr. Bruner explained that the thoracic outlet is an area at the top of the chest consisting of an oval opening leading into the arm through which nerve bundles and blood vessels pass over the first rib. He further explained that "thoracic outlet syndrome" is an anatomical condition whereby either *1057 the nerves or the blood vessels or both are pinched or impinged by pressure placed on them at the thoracic outlet. Dr. Bruner noted that this condition could be caused by muscle spasms in that area.
Dr. Bruner stated that the tests he performed were to determine if there was any compression on the nerve or vascular bundles in that area. He stated that the tests did not produce any pulse obliteration, indicative of compression; however, they did reproduce some pain in the plaintiff's left shoulder.
Dr. Bruner stated that there was no venous distention indicating the compression of a vein and that the muscle size of both arms was equal.
Dr. Bruner concluded that electrodiagnostic studies should be performed in order to rule out disc problems and to determine whether any pinched nerves existed and if so, to determine their location.
The plaintiff was referred to Dr. Shaw who performed an EMG and nerve conduction studies on December 7, 1983. The EMG study revealed normal results, however the nerve conduction study did suggest some evidence of a pinched nerve, consistent with thoracic outlet syndrome.
Dr. Bruner concluded, that based upon his physical examination of the plaintiff and the results of the studies performed by Dr. Shaw, that the plaintiff was suffering from thoracic outlet syndrome. He noted that trauma such as that suffered by the plaintiff in this auto accident commonly caused this condition.
Dr. Bruner revealed that there were three forms of treatment for this condition. Muscle relaxants and pain medication could be prescribed to relieve the muscle spasms and physical therapy was often suggested in order to strengthen the muscles around the shoulder to alleviate the pressure on the first rib. Dr. Bruner stated that if these two forms of treatment failed, then a surgical procedure could be tried. Dr. Bruner explained that a "first rib resection" is a procedure by which the first rib is removed so that the veins, arteries and nerves in that area are freed. Dr. Bruner stated that the decision to have the surgery is left up to the patient and that in trauma-induced thoracic outlet syndrome cases, there is only a fifty-fifty chance that the condition will be alleviated.
Dr. Bruner stated that he did not recommend surgery to the plaintiff, as his pain and symptoms were intermittent. He revealed that with nerve involvement, until the pain is constant, surgery is not usually recommended. Dr. Bruner further revealed that the plaintiff was not placed on any medication, but that he was told about exercises that he could perform at home to try and relieve the muscle spasms. The doctor noted that the plaintiff had indicated that he experienced some pain while playing the piano, but he did not indicate that this pain had interferred with his everyday work. Dr. Bruner, at the time of his first deposition, had not seen the plaintiff following the initial examination and did not know if he was still experiencing any pain.
Dr. Donald Smith, a neurosurgeon, examined the plaintiff on October 1, 1984. In his deposition taken November 5, 1984, he stated that his examination of Mr. Ortigo resulted in normal findings. There were no objective findings of any neurological loss. He stated that the plaintiff had given him a history of experiencing bruising and a strain to the left shoulder and chest area. Dr. Smith also indicated that he had a copy of Dr. Bruner's deposition and copies of the reports from Dr. Moufarrej and Dr. Shaw. He noted that there were some findings that could have suggested thoracic outlet syndrome. However, Dr. Smith stated that on the day he examined the plaintiff, he found none of the physical factors that would corroborate that syndrome or that would suggest any neurological involvement in the upper extremities. He also noted that there was a discrepancy in the nerve conduction study results performed by Dr. Moufarrej and by Dr. Shaw. He explained that each of the studies performed on the plaintiff indicated normal results except for that which was performed by Dr. Shaw indicating some decreased conduction velocity in the left ulnar *1058 nerve. He stated that the difference in time between the tests could account for that finding. He indicated that the remainder of their tests showed normal results.
Dr. Smith stated that the plaintiff told him that he had continued to have numbness and loss of sensation in his left arm since the time of the accident and that these conditions were induced by lifting the arm over his head or sleeping on his left side. Dr. Smith explained that the plaintiff indicated that playing the piano also seemed to exacerbate the symptoms. Dr. Smith also revealed that the plaintiff denied actual weakness in that arm and had stated that the "degree of symptom occurrence had been stable for the last six months to a year prior to this examination." The plaintiff had also indicated to Dr. Smith that he was continuing to perform all of his regular full-time work activities at the time of the examination.
Dr. Smith's physical examination revealed that there was no tenderness over the brachial plexus and no tenderness over any of the major nerve trunks in the plaintiff's upper extremities. Dr. Smith revealed that some pain was produced in the left shoulder when it was rotated to extreme ranges of motion which would suggest some mild limitation of the shoulder joint, itself; however, this was not the type of pain that one would ordinarily associate with nerve irritation. Dr. Smith also performed tests to elicit compression of the neurovascular bundle specifically at the thoracic outlet. He stated that the results of these tests were normal. Dr. Smith explained that one can sometimes obtain indirect evidence of a nerve compression by demonstrating compression of the artery or obliteration of the pulse by stretching the structures that pass through the thoracic outlet. His tests did not reveal any abnormal vascular compression in that area. Dr. Smith also indicated that there was no muscular atrophy in the plaintiff's left arm. Dr. Smith also performed a sensory examination, a pin prick test, which resulted in a negative finding with respect to thoracic outlet syndrome. Dr. Smith concluded that on the basis of this examination, there was no restriction of the neurovascular bundle passing through the thoracic outlet on Mr. Ortigo's left side. Noting that Mr. Ortigo had claimed that he was precluded from performing his part-time work activities, which involved the turning of large wheels on oil rigs, Dr. Smith indicated that as of the date of his examination, he did not see any basis for any type of limitation that would preclude Mr. Ortigo from performing this type of work.
Dr. Smith stated that although some of the symptoms experienced by the plaintiff could be suggestive of thoracic outlet syndrome, in most nerve compression or entrapment syndromes when these conditions exist over a long period of time, it is to be expected that they would produce changes in the nerves that could be detected by tests for anatomic sensory loss, muscular atrophy and other nerve dysfunctions. Dr. Smith stated that these conditions were not present in the plaintiff to such a degree that he would conclude that plaintiff was suffering from thoracic outlet syndrome as of the time of his examination. He noted that some degree of irritation and lingering pain in an area of an injury is not at all unheard of.
Dr. Bruner examined the plaintiff once again on November 30, 1984 as the plaintiff stated he was continuing to have intermittent pain in his left upper extremity. The doctor noted that there was some tenderness on the left side, again indicating that the muscles in that area could be in spasm. He also conducted pulse obliteration tests again which were normal, as were the deep tendon reflex tests. Also, there was still no muscular atrophy or venous distention. The hand grasp test was also repeated which indicated a thirty-four pound difference in the strength of the left side. There was also some depression in the pin prick of the plaintiff's left ring finger.
Dr. Bruner indicated that the plaintiff mentioned that he was experiencing some pain after he lifted anything heavy with his left arm and after he would play the piano. Dr. Bruner further hypothesized that with *1059 respect to the plaintiff's prior employment in the oil field, such activity could tend to aggravate a condition such as thoracic outlet syndrome. However, he stated that to be sure of such an aggravation, the plaintiff would have to go out and perform this activity to see if it would actually cause the pain in his arm. Dr. Bruner did not indicate that he prescribed any medication or course of physical therapy for the plaintiff after this examination.
At trial, the plaintiff, his father, and his wife all testified concerning the problems that the plaintiff was experiencing with his arm. The plaintiff indicated that he continued to experience pain in his arm after he performed certain types of manual labor. He noted that his arm did not bother him while he was working at his part-time employment, but that it would be sore afterwards and it would keep him from sleeping at night. He also indicated that he had problems playing the piano. The plaintiff stated, however, that he never took any medication for this condition and that it did not interfere with his primary job at P & L Implement Company.
Mr. Ortigo's father and wife also testified as to the plaintiff's complaints concerning the problems he was having in performing physical work with his left arm since the accident.
In Hayes v. Commercial Union Assurance Company, 459 So.2d 1245 (La.App. 1st Cir.1984), writ denied 462 So.2d 1247 (La.1985) the First Circuit Court of Appeal stated that:
Neither the District Court, as the trier of fact, nor this Court, as reviewer of fact and law, is required "to accept all of the testimony of any witness"; thus, either court "may believe and accept a part or parts of a witness' testimony and refuse to accept any part or parts thereof" insofar as deposition testimony is concerned. Holmes [ v. Southeastern Fidelity Ins. Co., 422 So.2d 1200], supra, page 1203. The District Court evaluated the live testimony of lay witnesses and the deposition testimony of medical experts. His evaluation of the lay testimony will not be disturbed unless it is found to be clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978).
On the basis of our examination of the deposition testimony and other medical evidence in the record, we conclude, in accordance with the trial court's decision, that although the plaintiff did suffer some pain and discomfort, his condition was not so disabling as to interfere with his primary employment or his general lifestyle. Although it was indicated that the plaintiff did experience some pain after hard physical labor, the plaintiff himself stated to one of the physicians that there was no significant weakness in his left arm.
With respect to the plaintiff's contention that the trial court did not afford sufficient weight to the opinions of his "treating physicians," we note that Dr. Green is the only physician who actually saw the plaintiff on a consistent basis. The trial court considered the deposition testimony of each of the physicians, noting that Dr. Bruner only examined the plaintiff twice and did not undertake to "treat" him in any manner. Dr. Smith examined the plaintiff on one occasion and had the same information as Dr. Bruner concerning the plaintiff's electrodiagnostic studies.
Although it is well-settled that the testimony of the treating physician is entitled to greater weight than the testimony of a physician who examines the patient only once or twice, (citations omitted), Berthelot v. Imes, 459 So.2d 1384 (La.App. 1st Cir.1984), it is evident in this case that neither Dr. Bruner nor Dr. Smith could be considered the treating physician and that their testimony could be afforded equal weight.
Therefore, the trial court, having considered the testimony of the lay witnesses and the conflicting testimony of the experts who were most knowledgeable about whether plaintiff was suffering from thoracic outlet syndrome, concluded that plaintiff had not proved this condition and disability by a preponderance of the evidence. As stated above, we agree with this *1060 assessment and conclude that the trial judge's determination on this point was not in error.
With respect to the plaintiff's contention that $9,000 was an inadequate award for general damages, our analysis of the record, including the depositions of the physicians who treated the plaintiff and with respect to the trial court's conclusions concerning lay testimony, fails to reveal that the trial court abused its discretion in making this award. Such an abuse of discretion is a prerequisite before this court may disturb the award made by the trial court. Hayes, supra.
The plaintiff also contends that the trial court erred in failing to award damages for future medical expenses which includes, primarily, the cost of the surgery discussed by Dr. Bruner. A review of the record in this case indicates that the trial judge was correct in denying recovery for this future expense as there is no evidence that the plaintiff would require this surgery. It is noted that the doctor's own testimony was such that the surgery was never recommended to the plaintiff.
The plaintiff finally contends that the trial court erred in awarding an inadequate sum for the loss of the plaintiff's part-time employment with Triton Oil and Gas Company. As noted by the trial court in its written reasons, the plaintiff called Dr. Melvin Harju, an economist, to project the value of this loss of income from the part-time employment. Dr. Harju based his estimations on the plaintiff's income of $900 a month from this employment. The calculations formulated by Dr. Harju with respect to this amount were incorrect, however, as he did not have the correct date for the plaintiff's termination of the part-time employment. He also was not provided with copies of Mr. Ortigo's 1981, 1982 and 1983 federal income tax returns which indicated that out of this $900 income from Triton, Mr. Ortigo only paid taxes on approximately $277 per month. The trial court noted that due to the lack of correct information, it afforded very little weight to Dr. Harju's testimony and concluded that an award of $4,709 would adequately compensate the plaintiff for the loss of this part-time employment. This figure was the result of the trial court's conclusion that the plaintiff was able to return to his part-time duties as of October 1, 1984. The plaintiff terminated his part-time employment in April, 1983. The trial court's award represents compensation of $277 a month for the seventeen month period between May 1983 and October 1984. We cannot find that the trial court abused its discretion in awarding this amount, as the record shows that it is apparent that the plaintiff was not suffering significant limitations as of October, 1984 which would preclude him from performing the duties of his part-time employment. The plaintiff had terminated his part-time employment prior to being examined by any of the doctors in this case. Therefore, their testimony with respect to the part-time employment was all based on hypothetical situations propounded by the attorneys in this case. Furthermore, as the trial court noted, there was some indication, based on the plaintiff's wife's testimony, that the termination of his part-time employment was not solely due to the problems he was having with his left arm. As noted by this court in Pringle, supra:
When a claim for lost wages cannot be proved with mathematical certainty, it can be estimated by any proof that reasonably establishes the claim, such as plaintiff's own testimony. The courts have reasonable discretion to assess damages based upon all the facts and circumstances of the case. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971); Erdey v. Steib, 392 So.2d 131 (La.App. 1st Cir.1980). Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to this case and this individual may a reviewing court determine that the award is inadequate. Reck v. Stephens, 373 So.2d 498 *1061 (La.1979); Cutchall v. Great American Pump Co., supra.
Therefore, we note in the instant case that the trial court had the opportunity to observe the plaintiff and to assess his credibility concerning the extent of his injuries and disabilities. An analysis of the facts and circumstances does not indicate that the trial court abused its discretion in assessing the damages awarded to plaintiff. Although the plaintiff testified that he did suffer a great deal of discomfort as a result of the accident, the record does not establish an abuse of discretion by the trial court. Therefore, we decline to increase the awards.
Accordingly, for the foregoing reasons, the judgment of the trial court is corrected to eliminate the twenty percent reduction calculated by the trial court. The trial court judgment is therefore amended in this respect and as amended, is affirmed.
The trial court judgment of June 20, 1985 is hereby amended to recast the first paragraph after the preamble as follows:
IT IS ORDERED, ADJUDGED AND DECREED, that there be judgment herein in favor of petitioner, ROBERT D. ORTIGO and against the defendants, JAMES I. MERRITT and COMMERCIAL UNION INSURANCE COMPANY, in solido, in the full sum of TWENTY-FOUR THOUSAND FIVE HUNDRED SEVENTY-THREE AND 30/100 ($24,573.30) DOLLARS, together with interest thereon at the rate of TWELVE (12%) PERCENT per annum from date of judicial demand until paid in full.
In all other respects, the trial court judgment is affirmed. The costs of this appeal are apportioned equally between plaintiff and defendants.
AFFIRMED.